Nash, J.
 

 We are of opinion there was error in the judgment pronounced by the presiding judge. On the argument here it has been urged, that the act of 1840, (ch. 30,) under which the defendant was prosecuted, is unconstitutional, being in violation of the 2d article of the amended constitution of the United States, and also of the 3d and 17th articles of the Bill of Rights of this State. We do not agree to the correctness of either of these objections. The Constitution of the United States was ordained and established by the people of the United States, for their own government, and not for that of the different States. The limitations of power, contained in it and expressed in general terms, are necessarily confined to the General Government. It is now the settled construction of that instrument, that no limitation upon the power of government extends to, or embraces the different States, unless they are mentioned, or it is expressed to be so intended.
 
 Barrow
 
 v.
 
 The Mayor,
 
 &c.
 
 of Baltimore,
 
 7 Peter’s Rep. 240.
 
 Raleigh and Gaston Rail Road Company
 
 v. Davis, 2 Dev. & Bat. 459. In the 2d article of the amended Constitution, the States are neither mentioned nor referred to. It is therefore only restrictive of the powers of the Federal Government. Nor do we perceive that the act of 1840 is in violation of either of the articles of our Bill of Rights, which have been referred to. The 3d article forbids the granting of
 
 *252
 
 exclusive privileges or separate emoluments, but in consideration of public services. Its
 
 terms
 
 are certainly not violated, Is it so in spirit ? If it is, we are as much bound to declare ^ act unconstitutional, as if in terms it was so — where the violation is plain and palpable. The act of 1840 imposes upon free men of color, a restriction in the carrying of fire arms, from which the white men of the country are exempt, is this a violation of the 3d article in spirit, or is it such a palpable violation, as will authorize the court to declare it void
 
 %
 
 If so, then is the whole of our legislation upon the subject of free negroes void. From the earliest period of our history, free people of color have been among us, as a separate and distinct class, requiring, from necessity, in many cases, separate and distinct legislation.
 

 The relation of master and servant, of free and bond, of white and colored, excluded the idea that the latter ought or could be safely admitted to testify against the former. Accordingly, in the year 1762 an act was passed, which excludes all colored persons within the fourth degree from being heard as witnesses against a white man. And in 1777 it is, in almost so many words, re-enacted, and still remains upon our statute book unrepealed. This was the code at the time our constitution was formed, and the statute of 1777 was framed by many of the men, who aided in forming the constitution. From the time of the first enactment to the present, innumerable cases have been tried in our various courts, in which white persons and colored have been parties litigant, and in which the testimony of colored witnesses would have been important; and yet, in no instance, has the constitutionality of the act of 1777 been questioned. It is admitted that, if the act of 1840 does violate the spirit and meaning of the 3d article, it cannot be sustained, because the legislature have passed other acts equally infringing it; but it is believed, that the long acquiescence under the act of 1777 by all classes of society — legislative, judicial, and private — has given an exposition to the 3d article of the bill of rights, which is obligatory on the courts. The extent and operation of this article were brought under
 
 *253
 
 the consideration of this court in the case of the
 
 State v. Manuel,
 
 4 Dev. & Bat. 20. That case underwent a very laborious investigation, both by the bar and the bench. In the year w t ^ 1831, the legislature passed an act, providing, that when a free person of color was convicted by due course of law of a misdemeanor, and was unable to pay the fine imposed on him) the court should direct the sheriff to hire him out at public auction, to any person who would pay the fine for his services for the shortest space of time. Manuel was a free man of color, and, being convicted of an assault and battery, and unable to pay his fine, was ordered by the court to be hired out. The case was brought here by appeal, and was felt to be one .of great importance in principle. It was considered with an anxiety and care, worthy of the principle involved, ¡.nd which gave it a controlling influence and authority on all questions of asimilar character. The act of [831, it was urged, was unconstitutional, as violating, among others, this 3d article of the Bill of Rights. The court decided, that it did not conflict with that article; yet it cannot be denied, that it introduced a different mode of punishment, in the case of a colored man and a white man for the same offence. If the law in that case, in which one class of citizens is condemned to lose their liberty, by being hired out as slaves, while another class is exempt from that ignominious mode of punishment, and subjected to one much less revolting to the feelings of a freeman, is not a violation of the 3d article under consideration, much less can the act of 1840 be so. Other acts of the legislature might be pointed out, equally liable to the constitutional objection. The act of 1840 is one of police regulation. It does not deprive the free man of color of the right to carry arms about his person, but subjects it to the control of the County Court, giving them the power to say, in the exercise of a sound discretion, who, of this class of persons, shall have a right to the licence, or whether any shall. This brings us to the consideration of the 17th article of the Bill of rights. We cannot see that the act of 1840 is in conflict with it. That article declares “that the people have a right to bear arms for the defence of the
 
 *254
 
 State.” The defendant is not indicted for carrying arms in '""defence of the State, nor does the act of1840 prohibit him from so doing. Its only object is to preserve the peace and safety ^ community from being disturbed by an indiscriminate use, on ordinary occasions, by free men of color, of fire arms or other arms of an offensive character. Self preservation is the first law of nations, as it is of individuals. And, while we acknowledge the solemn obligations to obey the constitution, as well in spirit as in letter, we at the same time hold, that nothing should be interpolated into that instrument, which the people did not will. We are not at liberty to give an artificial and constrained interpretation to the language used, beyond its ordinary, popular and obvious meaning. Before, and at the time our constitution was framed, there was among us this class of people, and they were subjected to various disabilities, from which the white population was exempt. It is impossible to suppose, that the framers of the Bill of Rights did not have an eye to the existing state of things, and did notact with a full knowledge of the mixed population, for whom they were legislating. They must have felt the absolute necessity of the existence of a power somewhere, to adopt such rules and regulations, as the safety of the community might, from time to time, require. “Constitutions are not themes for ingenious speculations, but fundamental laws, ordained for practical purposes.” As a further illustration of the will of the people, as to the light in which free people of color are to be considered as citizens, the present constitution of the State entirely excludes them from the exercise of the elective franchise. Rev. Stat. 21. Nor does the new constitution, in any of its provisions, over-rule or contravene the preceding legislation on the subject we are considering. Wo
 
 must,
 
 therefore, regard it as a principle, settled by the highest authority, the organic law of the country, that the free people of color cannot be considered as citizens, in the largest sense of the term, or, if they are, they occupy such a position in society, as justifies the legislature in adopting a course of policy in its acts peculiar to them; so that they do not violate those great principles of justice, which
 
 *255
 
 ought to lie at the foundation of all laws. In conclusion, we would adopt the language of the court in the case of Manuel, “ Upon full consideration of all the objections, urged by the prisoner’s counsel, we do not find such clear repugnancy between the constitution and the act of 1840, as to warrant us in declaring that act unconstitutional and void.” We are therefore of opinion, there was error in rendering judgment against the State.
 

 This decision must be certified to the Superior Court of Cumberland County, with directions to proceed to judgment and sentence thereon, agreeably to this decision and the laws of the State.
 

 Per Curiam, Ordered accordingly.
 

 The following is a copy of the act:
 

 Be it enacted, -c.
 
 That if any free negro, mulatto, or free person of color, shall wear or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger or bowie-knife, unless he or she shall have oh ained a licence therefor from the Court of Pleas and Quarter Sessions of his or her county, wiihin one year preceding the wearing, keeping or carrying thereof, he or she shall be g.uilty of a misdemeanor, and may ba indieied therefor,