STATE v. O. W. KERNER.

(Filed 11 May, 1921.)

1. **Constitutional Law—Criminal Law—Statutes—Weapons—Arms—Unconcealed Weapons.**

    A statute making the carrying of a weapon, specifying pistols, among other things, from the premises unconcealed, a misdemeanor and punishable the same as if carried concealed, unless a permit be first obtained upon a statement of the purpose for which it was to be carried, the payment of a $5 license fee and the giving of a $500 bond, exceeds the legislative power of police regulation and is in violation of the declaration of rights in our State Constitution, that "The right of the people to keep and bear arms shall not be infringed," with proviso that "nothing herein contained shall justify the practice of carrying concealed weapons or prevent the Legislature from enacting statutes against said practice." Const., Art. I, sec. 24. *Semble,* a pistol is included in the word "arms" *ex vi termini.*

2. **Same—Questions of Law—Trials—Case Agreed.**

    Where it appears from a special verdict that the defendant was tried for carrying an unconcealed weapon, made a misdemeanor under a public-local statute; that he had been accosted on the street of a town by one who desired to bring about a fight, and that the defendant then put down some packages he was carrying and went to his store and returned with a pistol, carrying it openly: *Held,* the offense created by the statute was unconstitutional, and a conviction thereunder could not be sustained, as a matter of law.

WALKER, J., concurring in result; ALLEN, J., concurring; STACY, J., concurring in opinion of ALLEN, J.

APPEAL by State from *Webb, J.,* at January Term, 1921, of FORSYTH. The defendant was indicted on a first count for carrying a concealed

weapon, and on the second count for carrying a pistol off his premises unconcealed. There was a special verdict, which found the defendant was walking along the streets of the town of Kernersville in Forsyth County carrying some packages, when he was accosted, for the purpose of engaging him in a fight, by one Matthews; that in the course of this altercation he set down his packages and went to his place of business and there procured a pistol, which he brought back with him unconcealed to the scene of the altercation. Sec. 3, ch. 317, Public-Local Laws 1919, prohibits the carrying of such weapons off his own premises by any one in Forsyth without a permit, even though it was not concealed. The court, being of the opinion that this statute was in conflict with the constitutional provision that "the right to bear arms shall not be infringed," directed a verdict of not guilty, and the State appealed.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*
*Jones & Clement for defendant.*

CLARK, C. J. The second amendment to the United States Constitution, which provides that "the right of the people to keep and bear arms shall not be infringed," does not apply, for it has been repeatedly held by the United States Supreme Court and by this Court, and, indeed, by all courts, that the first ten amendments to the United States Constitution are restrictions upon the Federal authority and not upon the states. *In re Briggs,* 135 N. C., 120; *S. v. Patterson,* 134 N. C., 617; *S. v. Newsom,* 27 N. C., 250; *U. S. v. Cruikshank,* 92 U. S., 542; 9 Rose's Notes (Rev. Ed.), 152.

The Constitution of this State, sec. 24, Art. I, which is entitled, "Declaration of Rights," provides: "The right of the people to keep and bear arms shall not be infringed," adding, "Nothing herein contained shall justify the practice of carrying concealed weapons, or prevent the Legislature from enacting penal statutes against said practice." This exception indicates the extent to which the right of the people to bear arms can be restricted; that is, the Legislature can prohibit the carrying of concealed weapons, but no further. This constitutional guarantee was construed in *S. v. Speller,* 86 N. C., 697, in which it was held that the distinction was between the "right to keep and bear arms," and the "practice of carrying concealed weapons." The former is a sacred right, based upon the experience of the ages in order that the people may be accustomed to bear arms and ready to use them for the protection of their liberties or their country when occasion serves. The provision against carrying them concealed was to prevent assassinations or advantages taken by the lawless, i. e., against the abuse of the privilege.

This provision of the Constitution has also been cited and discussed in *S. v. Reams,* 121 N. C., 556; and in *S. v. Boone,* 132 N. C., 1108.

Chapter 317, Public-Local Laws 1919, applicable only to Forsyth County, provides: Section 1 prohibits the carrying of concealed weapons; section 2 requires a permit, and section 3 provides: "If any person, except when on his own premises, shall carry any weapon (named in section 1) without a permit (as provided in section 2) he is guilty of a misdemeanor and punished as provided in section 1 for carrying a concealed weapon." The weapons named in section 1 include pistols, and the question as presented is whether this conflicts with the constitutional provisions above cited.

The other weapons recited in section 1 of this act, besides "pistol," are, "bowie knife, dirk, dagger, slung-shot, loaded cane, brass, iron or metallic knucks, or razor, or other deadly weapon of like kind." None of these, except "pistol," can be construed as coming within the meaning of the word "arms" used in the constitutional guarantee of the right to bear arms. We are of the opinion, however, that "pistol" *ex vi termini* is properly included within the word "arms," and that the right to bear such arms unconcealed cannot be infringed. The historical use of pistols as "arms" of offense and defense is beyond controversy.

It is true that the invention of guns with a carrying range of probably 100 miles, submarines, deadly gasses, and of aeroplanes carrying bombs and other modern devices have much reduced the importance of the pistol in warfare except at close range. But the ordinary private citizen, whose right to carry arms cannot be infringed upon, is not likely to purchase these expensive and most modern devices just named. To him the rifle, the musket, the shotgun, and the pistol are about the only arms which he could be expected to "bear," and his right to do this is that which is guaranteed by the Constitution. To deprive him of bearing any of these arms is to infringe upon the right guaranteed to him by the Constitution.

It would be mockery to say that the Constitution intended to guarantee him the right to practice dropping bombs from a flying machine, to operate a cannon throwing missiles perhaps for a hundred miles or more, or to practice in the use of deadly gasses. In Cooley Const. Lim., the history and the intention of this provision is thus set forth: "Among the other safeguards to liberty should be mentioned the right of the people to keep and bear arms. A standing army is peculiarly obnoxious in any free government, and the jealousy of such an army has at times been so strongly manifested in England as to lead to the belief that even though recruited from among themselves, it was more dreaded by the people as an instrument of oppression than a tyrannical monarch or any foreign power. So impatient did the English people become of the very

army that liberated them from the tyranny of James II that they demanded its reduction even before the liberation became complete; and to this day the British Parliament render a standing army practically impossible by only passing a mutiny act from session to session. The alternative to a standing army is "a well-regulated militia"; but this cannot exist unless the people are trained to bearing arms. The Federal and State constitutions, therefore, provide "that the right of the people to bear arms shall not be infringed."

We know that in the past this privilege was guaranteed for the sacred purpose of enabling the people to protect themselves against invasions of their liberties. Had not the people of the Colonies been accustomed to bear arms, and acquire effective skill in their use, the scene at Lexington in 1775 would have had a different result, and when "the embattled farmers fired the shot that was heard around the world" it would have been fired in vain. Had not the common people, the rank and file, those who "bore the burden of the battle" during our great Revolution, been accustomed to the use of arms the victories for liberty would not have been won and American Independence would have been an impossibility.

If our pioneers had not been accustomed to the use of arms the Indians could not have been driven back, and the French, and later the British, would have obtained possession of the valley of the Ohio and the Mississippi. If the frontiersmen had not been good riflemen, particularly the riflemen from Tennessee and Kentucky, the battle of New Orleans would have been lost and the frontiers of this country would have stood still at the Mississippi.

In our own State, in 1870, when Kirk's militia was turned loose and the writ of *habeas corpus* was suspended, it would have been fatal if our people had been deprived of the right to bear arms, and had been unable to oppose an effective front to the usurpation.

The maintenance of the right to bear arms is a most essential one to every free people, and should not be whittled down by technical constructions. It should be construed to include all such "arms" as were in common use, and borne by the people when this provision was adopted. It does not guarantee on the one hand that the people have the futile right to use submarines and cannon of 100 miles range, nor aeroplanes dropping deadly bombs, nor the use of poisonous gasses, nor on the other hand does it embrace dirks, daggers, slung-shots, and brass knuckles, which may be weapons, but are not, strictly speaking, "arms" borne by the people at large, and which are generally carried concealed. The practical and safe construction is that which must have been in the minds of those who framed our organic law. The intention was to embrace the "arms," an acquaintance with whose use was necessary for their protection against the usurpation of illegal power—such as rifles,

37—181

muskets, shotguns, swords, and pistols. These are now but little used in war, still they are such weapons that they or their like can still be considered as "arms," which they have a right to "bear."

It is dangerous to minimize these guarantees, based upon the wisdom of the ages, which have been imbedded in our organic law. It has been well said that when the word weapon is used in a statute it denotes fire-arms, which includes pistols, but does not embrace brass knuckles, slung-shots, or weapons of like description. 40 Cyc., 852, and cases there cited: *State v. Buzzard,* 4 Ark., 18; *English v. State,* 35 Tex., 473. This distinction is upheld in *Aymette v. State,* 21 Tenn. (2 Humphreys), 155; *Andrews v. State,* 3 Heis (Tenn.), 165; *State v. Wilburn,* 66 Tenn. (7 Baxter), 57; *Wilson v. State,* 33 Ark., 557; *Nunn v. Georgia,* 1 Kelly (Geo.), 243; *Stockdale v. Georgia,* 32 Ga., 225.

It would also be a reasonable regulation, and not an infringement of the right to bear arms, to prohibit the carrying of deadly weapons when under the influence of intoxicating drink, or to a church, polling place, or public assembly, or in a manner calculated to inspire terror, which was forbidden at common law. These from a practical standpoint are mere regulations, and would not infringe upon the object of the constitutional guarantee, which is to preserve to the people the right to acquire and retain a practical knowledge of the use of fire-arms. *S. v. Shelby,* 90 Mo., 302.

It is also but a reasonable regulation, and one which has been adopted in some of the states, to require that a pistol shall not be under a certain length, which, if reasonable, will prevent the use of pistols of small size, which are not borne as arms, but which are easily and ordinarily carried concealed. To exclude all pistols, however, is not a regulation, but a prohibition, of arms, which come under the designation of "arms" which the people are entitled to bear. This is not an idle or an obsolete guarantee, for there are still localities, not necessary to mention, where great corporations, under the guise of detective agents or private police, terrorize their employees by armed force. If the people are forbidden to carry the only arms within their means, among them pistols, they will be completely at the mercy of these great plutocratic organizations. Should there be a mob, is it possible that law-abiding citizens could not assemble with their pistols carried openly and protect their persons and their property from unlawful violence without going before an official and obtaining license and giving bond?

The usual method when a country is overborne by force is to "disarm" the people. It is to prevent the above and similar exercises of arbitrary power that the people in creating this Government "of the people, by the people, and for the people," reserved to themselves the right to "bear arms" that accustomed to their use they might be ready to meet illegal

STATE *v.* KERNER.

force with legal force by adequate and just defense of their persons, their property, and their liberties, whenever necessary. We should be slow, indeed, to construe such guarantee into a mere academic expression which has become obsolete.

We can have no knowledge of the future except by the past, or as Patrick Henry said, "The only light by which our feet are guided is the lamp of experience." The constitutional provision which forbids any prohibition upon the people to bear arms and use them effectively by being accustomed to their use should be strictly and stoutly maintained, for we know not when the occasion may again require the assertion of that doctrine which was one familiar throughout this country that, "Resistance to tyranny is obedience to God," or the defense of person and property against mobs and violence.

The statute in this case, Public-Local Laws 1919, ch. 317, is especially objectionable in that it requires (sec. 2) that in order to carry a pistol off his own premises, even openly, and for a lawful purpose, the citizen must make application to the municipal court, if a resident of a town; or to the Superior Court if not residing in town, "describing the weapon and giving the time and purpose for which it may be carried off his premises, and must pay to the clerk of the court the sum of $5 for each permit, and must file a bond in the penalty of $500 that he will not carry the weapon except as so authorized." In the case of a riot or mob violence, or other emergency requiring the defense of public order, this would place law-abiding citizens entirely at the mercy of the lawless element. As a regulation, even, this is void because an unreasonable regulation, and, besides, it would be void because for all practical purposes it is a prohibition of the constitutional right to bear arms. There would be no time or opportunity to get such permit and to give such bonds on an emergency.

On this occasion, the defendant, threatened with violence, was forced to abandon his property. He went to his place of business, where he had the right to keep his pistol, "being on his own premises," and returned with it unconcealed. He was acting in self-defense of his person and in defense of his property. The court below most properly adjudged, upon the special verdict, that he was not guilty.

No error.

WALKER, J., concurring in result.

ALLEN, J., concurring: The right to bear arms, which is protected and safeguarded by the Federal and State constitutions, is subject to the authority of the General Assembly, in the exercise of the police power, to regulate, but the regulation must be reasonable and not prohibitive, and must bear a fair relation to the preservation of the public peace and safety.

This is, I think, the correct principle, and it appears to me the constitutional privilege is infringed by the act, under which the defendant is indicted, as it makes one guilty of a violation of law, who carries a pistol off his own premises openly and for a lawful purpose without a permit, and he is required to pay $5 and to give a bond in the sum of $500 before the permit can issue.

No provision is made for an emergency, and no exception in favor of one who carries a pistol off his premises openly, in the necessary defense of his person or property, when he has had no opportunity to secure a permit.

STACY, J., concurs in this opinion.