STATE OF NORTH CAROLINA v. EDWARD W. DAWSON.

(Filed 2 February, 1968.)

**1. Property § 4—**

Evidence of the State tending to show that the padlocked door of a home had been pried open, that the letters KKK had been sprayed with paint both on the inside and outside of the house, that the defendant and three friends were seen riding in a truck in the immediate neighborhood

on the night of the defacing, and that a can of spray paint found in the truck was similar in composition to the paint discovered on the walls of the house, *held* insufficient to be submitted to the jury on the issue of defendant's guilt of violating G.S. 14-144, since the circumstantial evidence raises no more than a suspicion that defendant defaced the dwelling.

**2. Same—**

The indictment in this case *held* sufficient to charge the offense of unlawfully and wilfully defacing a house in violation of G.S. 14-144.

**3. Same—**

Evidence of the State tending to show that three or four shots were fired into a home by the occupants of a truck, that 60 feet from the dwelling were found empty casings for a rifle and pistol, and that a test conducted by a ballistics expert revealed that the casings had been fired from guns found in defendant's truck, *held* sufficient to be submitted to the jury on the issue of defendant's guilt of the offense of wilfully injuring a house.

**4. Criminal Law § 9—**

When two or more persons aid and abet each other in the commission of a crime, all being present, all are principals and equally guilty.

**5. Criminal Law § 158—**

Where the charge of the court is not included in the case on appeal, it will be presumed that the judge correctly instructed the jury with respect to the law and the evidence.

**6. Constitutional Law § 17—**

The purpose of the constitutional guaranty of the right to bear arms is to secure a well regulated militia, but the individual has the right, subject to reasonable regulation by the Legislature, to possess a weapon in order to exercise his common law right of self-defense.

**7. Same; Unlawful Assembly—**

The constitutional guaranty of the right to bear arms, N. C. Constitution, Art. I, § 24, does not abrogate the common law offense of going armed with unusual weapons to the terror of the people.

**8. Unlawful Assembly—**

An indictment alleging that the defendant armed himself with unusual and dangerous weapons for the unlawful purpose of terrorizing the people of the county and that, thus armed, the defendant went about the public highways of the county in a manner to cause terror to the people, *held* sufficient to charge the common law offense.

**9. Same—**

The evidence in this case *held* sufficient to be submitted to the jury on the issue of defendant's guilt of the offense of going armed with unusual and dangerous weapons to the terror of the people.

LAKE, J., concurring in part and dissenting in part.

HIGGINS, J., joins in concurring and dissenting opinion.

APPEAL by defendant from *McKinnon, J.,* February 1967 Session of ALAMANCE.

STATE *v.* DAWSON.

Defendant Edward W. Dawson, together with Robert H. Coleman, Hugh Vaughn, Jr., and James G. Buck, was tried upon five counts contained in four bills of indictment, which are summarized below:

Bill No. 47 charges that defendant and the three other persons named above, on 24 November 1966, did unlawfully assault Ernest Farrington with a deadly weapon, a pistol.

Bill No. 48 charges (1) that defendant and the aforesaid three other persons, without intent to commit a felony, on 24 November 1966, did break and enter the dwelling of Lawrence Williamson, in which his personal property was kept, and (2) that on the same day they did unlawfully, wilfully, and maliciously damage and deface the dwelling house of Lawrence Williamson by painting the letters KKK thereon.

Bill No. 49 charges that defendant and the three other persons heretofore named, on 24 November 1966, did unlawfully, wilfully and maliciously injure the dwelling house of Sarah Foust by firing bullets into the windows and walls and by painting on it the letters KKK.

Bill No. 50 charges that defendant and the aforesaid three persons, on 24 November 1966, "did unlawfully & wilfully arm themselves with unusual and dangerous weapons, to wit: Pistols and Rifles and, for the wicked and mischievous purpose of terrifying and alarming the citizens of Alamance County, did ride or go about the public highways of Alamance County without lawful excuse armed with said weapons in a manner as would cause a terror and annoyance and danger to the citizens of said County. . . ."

Appellant, defendant Dawson, through his present counsel, moved to quash each of the bills of indictment. The motions were overruled, and defendant entered a plea of not guilty to each charge. The cases were consolidated for trial. At the conclusion of the State's evidence, defendant also rested and moved for a judgment of nonsuit. The motion was denied. In case No. 47, the jury was unable to reach a verdict, and a mistrial was declared. In each of the other cases, the verdict was "guilty as charged."

The following prison sentences were imposed: In case No. 48, both counts consolidated for judgment, 12 months, prison sentence suspended for 5 years upon the usual conditions; case No. 49, 18 months; case No. 50, 18 months to run concurrently with the sentence imposed in case No. 49.

From the judgments entered, defendant Dawson appealed.

*T. W. Bruton, Attorney General; Millard R. Rich, Jr., Assistant Attorney General, for the State.*

*Lester V. Chalmers, Jr., for defendant.*

SHARP, J. Defendant's assignments of error raise only two questions: (1) Does each of the indictments charge a crime, and (2) will the State's evidence withstand the motions for nonsuit? The charge of the court is not in the record, and no exceptions to the admission of evidence were brought forward. Since the judge declared a mistrial in case No. 47 because the jury was unable to agree upon a verdict, the sufficiency of the evidence to sustain the charge in that case is not before us. The indictment itself sufficiently charges an assault with a deadly weapon. The four cases having been consolidated for trial, and none of the testimony restricted to a particular case, evidence pertinent to any case may be considered with reference to it.

The State's evidence tends to show the following facts: Ernest Farrington operates the E & R Grocery, a small store on N. C. Highway No. 54 about 4 miles east of Graham. Between 9:00 and 10:00 p.m. on 24 November 1966, the lights were on both inside and outside the store. The light was also burning on the porch of the Farrington residence across the road from the store. In the front of the grocery were two big windows and a picture window. Farrington was alone in the store when a bullet came through the wall about a foot below the right window and struck a television two feet from where he was standing.

At the time the shot was fired, Farrington's 16-year-old daughter Ernestine and her date, Earl Torrain, were standing in the front yard of the Farrington home. They heard a motor vehicle approach and slow down as if to stop. A noise, which they thought to be a shot, caused them to turn around. They saw a light green or blue, late-model truck speed away toward Graham. It was equipped with metal rods or pipes resembling a rack extending from the end of the bed forward over the cab. Mr. Farrington came out of the store and told Ernestine to tell her mother that somebody had shot into the store and to call the sheriff. He himself, however, immediately crossed the road and called Sheriff Stockard, who arrived in about fifteen minutes.

At about 9:57 p.m., Deputy Sheriff Hargrove, who was driving on Interstate 85, was notified of the shooting by radio from the sheriff's office. He turned off onto N. C. Highway No. 54 about five miles from the E & R Grocery. Two miles out of Graham, he met a truck fitting the description he had received over the radio. He turned around and followed the truck to Pine Street where he stopped it. Defendant Dawson was driving; "four subjects were in the truck" — defendant, Vaughn, Coleman, and Buck. When Hargrove opened the door to the cab he saw a 30-caliber carbine in the floorboard on the right-hand side. On the dashboard were four pistols: a 25-caliber automatic, a 38-caliber pistol, a 22 revolver, and a 22-target pistol.

Defendant Dawson said that the target pistol was his and that the carbine belonged to Buck. Coleman claimed the 38-caliber pistol. The men unloaded the weapons and turned them over to Hargrove at the time.

At 10:10 p.m., Sheriff Stockard went to Pine Street where the deputy had the truck stopped and then proceeded to the E & R Grocery where he talked to Farrington, his daughter, and Torrain. While there, he removed a projectile from the television. He then took Miss Farrington to Graham where she viewed the truck which Deputy Sheriff Hargrove had stopped on Pine Street. It was light green. She said that, in her opinion, it was the truck from which the shot had been fired into the store. A photograph of the truck was introduced in evidence as State's Exhibit 4, and both Miss Farrington and Torrain testified that it represented the truck with its rack of pipes or rails, which they described in their testimony.

After talking to Ernestine Farrington on the night of 24 November 1966, Sheriff Stockard warned defendant of his constitutional rights and asked him if he wished to make any statement. Defendant said that he did not, and he made none. The next day, the sheriff searched the truck and found in it two pressurized cans of paint. One was on the floorboard of the cab and the other in a toolbox in the rear of the truck.

About 9:30 p.m. on 24 November 1966, Nellie Mae Foust was at home in the trailer which she occupied with her three small children on Covington Road, a dead-end street off of Highway No. 54. That night she observed two cars and a truck, which was either blue and white or green, go by her trailer and stop in front of the Sarah Foust house next door. The next house beyond Mrs. Sarah Foust's belongs to Lawrence Williamson. Next to it is a trailer, and the last house at the end of the road belongs to Elmina Wood. None of the dwellings below Nellie Mae Foust's trailer was occupied on the night of 24 November 1966. When the two cars and truck stopped in front of Sarah Foust's house, the lights on the vehicles were turned off and, later on, she "heard them shooting." Three or four shots were fired at the Sarah Foust home.

When the vehicles came out, the truck pulled off to the right as it went by Nellie Mae Foust's trailer. It did not stop, but a shot was fired at the trailer. The next day, she found a hole in her refrigerator and called Sheriff Stockard. He came and discovered that a bullet had entered the trailer about two feet to the left of the front door and struck the refrigerator.

Sheriff Stockard also examined the Lawrence Williamson home, six to seven hundred yards down the road from the Foust trailer.

He found that the letters KKK had been sprayed on the side of the house with white paint. The padlock on the back door had been pried off, and the letters KKK had also been sprayed on a picture hanging on the wall. A sample of the paint used was sent to the laboratory of the State Bureau of Investigation, but its report showed only that the paint used was similar to that found in the truck.

On the right-hand side of the door to the residence of Mrs. Sarah Foust, the sheriff found that the letters KKK had also been sprayed in white paint. To the left of the door, he found approximately five bullet holes. Sixty feet from the front of this house, he found three empty casings for a 30-caliber carbine and an empty casing for a 25-caliber pistol. These casings (State's Exhibit 3), he sent to the SBI in a sealed envelope. He also removed two projectiles from the rafters in the ceiling. John Boyd, a ballistics specialist in charge of the firearms section of the SBI Criminal Laboratory, test-fired bullets from the 30-caliber carbine and the 25-caliber pistol taken from the truck which defendant was driving on the night of 24 November 1966. He then compared the cartridges which he had fired with the casings contained in State's Exhibit 3. In his opinion, these casings had been fired from the carbine and the 25-caliber pistol found in defendant's truck.

The first count in the indictment in case No. 48 sufficiently charges the misdemeanor of nonfelonious breaking and entering the dwelling house of Lawrence Williamson, which contained personal property (a violation of G.S. 14-54). 2 Strong, N. C. Index 2d, Burglary and Unlawful Breakings § 2 (1967). The second count likewise adequately charges a violation of G.S. 14-144, that is, that defendant *et al.* did unlawfully and wilfully deface the home of Lawrence Williamson by painting the letters KKK thereon. We are constrained to hold, however, that the evidence is not sufficient to establish the violations alleged. It was sufficient to show that the padlock on the back door of the Williamson house had been broken and the house entered, and that somebody had sprayed paint both on the inside and outside of the house. It does not, however, disclose when these acts were committed or by whom. The finger of suspicion points to defendant and his three associates on the night of 24 November 1966, but the evidence does not satisfy the test for circumstantial evidence which was laid down in *State v. Stephens*, 244 N.C. 380, 93 S.E. 2d 431. See also *State v. Bogan*, 266 N.C. 99, 145 S.E. 2d 374. The motion of nonsuit in case No. 48 should have been allowed.

Bill No. 49 also charges a violation of G.S. 14-144. It specifically alleges the ownership and location of the house alleged to have been unlawfully and wilfully damaged (1) by firing bullets into the win-

dows and walls and (2) by painting the letters KKK on the dwelling house. The indictment, clearly alleges all the constituent elements of the crime of unlawfully and wilfully injuring a house. It is, therefore, sufficient. 2 Strong, N. C. Index, Indictment and Warrant § 9 (1959).

The evidence pertaining to case No. 49, when considered in the light most favorable to the State — as we are required to consider it in dealing with the motion for nonsuit — is sufficient to establish the following facts: The three empty casings from a 30-caliber carbine and the one from a 25-caliber pistol, which were found 60 feet from the Sarah Foust home, were fired from the carbine and pistol which law-enforcement officers took from defendant's truck about 10:00 p.m. on 24 November 1966. This truck was light green. The truck which Nellie Mae Foust saw go by her trailer on a dead-end road, and from which shots were fired at the Sarah Foust house, was either light green or blue and white. Shots were also fired at the Nellie Mae Foust trailer from this truck as it went out.

There is no evidence as to which one of the occupants of the truck fired the shots but when two or more persons aid and abet each other in the commission of a crime, all being present, all are principals and equally guilty. *State v. Peeden,* 253 N.C. 562, 117 S.E. 2d 398. It is a permissible inference that the four men, who were riding the roads of Alamance County on the night of 24 November 1966 in the cab of a truck containing a carbine and four pistols, were motivated by a common purpose and engaged in a joint enterprise. Evidence that defendant was criminally responsible for the firing of bullets into the Sarah Foust home on the night of 24 November 1966 was sufficient to sustain his conviction in case No. 49 even though — as in case No. 48 — the evidence was not sufficient to establish his participation in the painting of the letters KKK on the house. Under the law, proof of defacement by either bullets or paint would be sufficient to sustain a conviction under G.S. 14-144. The charge is not included in the case on appeal, but it is presumed that the judge correctly instructed the jury. 3 Strong, N. C. Index 2d, Criminal Law § 158 (1967). The motion of nonsuit in case No. 49 was properly overruled.

The purpose of bill No. 50 is to charge the common-law misdemeanor known as going armed with unusual and dangerous weapons to the terror of the people. This offense was incorporated in the statute of 2 Edw. III, ch. 3, which provided that any one who appears before the King's justices or other ministers with force and arms, or brings force "in affray of the peace," or goes armed by night or day in any fair, market, or elsewhere in such a manner as

to terrify the King's subjects, is guilty of a misdemeanor. 3 Burdick, Law of Crime § 741 (1946). In the report of Sir John Knight's Case, 87 Eng. Rep. 75, "An information was exhibited against him by the Attorney General, upon the statute of 2 Edw. 3, c. 3. . . . . The information sets forth, that the defendant did walk about the streets armed with guns, and that he went into the church of St. Michael, in Bristol, in the time of divine service, with a gun, to terrify the King's subjects, *contra formam statuti.* . . . The Chief Justice said, that the meaning of the statute of 2 Edw. 3, c. 3, was to punish people who go armed to terrify the King's subjects. It is likewise a great offence at the *common law,* as if the King were not able or willing to protect his subjects; and therefore this Act is but an affirmance of that law; and it having appointed a penalty, this Court can inflict no other punishment than what is therein directed." *Id.* at 75-76.

This Court adopted the views expressed in Sir John's Case when, in 1843, it decided the case of *State v. Huntley,* 25 N.C. 418. In that case, the defendant was tried upon a bill of indictment which charged that, on 1 September 1843, he armed himself with pistols, guns, knives, and other dangerous and unusual weapons and went forth and openly exhibited himself, both in the daytime and in the night, to the good citizens of Anson County, and in the highway did publicly declare a purpose and intent to beat, wound, kill, and murder one James H. Ratcliff and other good citizens of the State; that by this conduct of Robert S. Huntley, "divers good citizens of the State were terrified, and the peace of the State endangered, to the evil example of all others in like cases offending, to the terror of the people, and against the peace and dignity of the State."

From the evidence, it appeared "that the defendant (Huntley) was seen by several witnesses, and on divers occasions, riding upon the public highway, and upon the premises of James H. Ratcliff . . . armed with a double-barreled gun," and that, on some of those occasions, he was heard to make threats against Ratcliff's life. The defendant's motion for a directed verdict of not guilty was overruled. The jury found him guilty and he appealed from the sentence imposed, contending that the offense of going armed with unusual and dangerous weapons to the terror of the people was created by the statute of Northampton, 2 Edw. III, ch. 3, and that this statute was not in force in this State. In disposing of this contention, Gaston, J., said:

". . . We have been accustomed to believe, that the statute referred to did not *create* this offense, but provided only special penalties and modes of proceeding for its more effectual suppression, and ·

of the correctness of this belief we can see no reason to doubt. All the elementary writers, who give us any information on the subject, concur in this representation, nor is there to be found in them, as far as we are aware of, a dictum or intimation to the contrary. Blackstone states that 'the offense of riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is *particularly* prohibited by the statute of Northampton, 2 Edward III, ch. 3, upon pain of forfeiture of the arms, and imprisonment during the King's pleasure.' 4 Bl. Com. 149. Hawkins, treating of offenses against the public peace under the head of 'Affrays,' pointedly remarks, 'but granting that no *bare words* in judgment of law carry in them *so much terror as to amount to an affray,* yet it seems certain that in some cases there may be an affray, where there is no actual violence, as where a man arms himself with dangerous and unusual weapons in such a manner as will naturally cause a terror to the people, *which is said to have been always an offense at common law* and *strictly* prohibited by many statutes.' Hawk. P. C., B. 1, ch. 28, sec. 1. . . . [I]t is difficult to imagine any (acts) which more unequivocally deserve to be so considered than the acts charged upon this defendant. They attack directly that public order and sense of security, which it is one of the first objects of the common law, and ought to be of the law of all regulated societies to preserve inviolate — and they lead almost necessarily to actual violence. Nor can it for a moment be supposed that such acts are less mischievous here or less the proper subjects of legal reprehension, than they were in the country of our ancestors. The bill of rights in this State secures to every man, indeed, the right to 'bear arms for the defense of the State.' While it secures to him a *right* of which he cannot be deprived, it holds forth the *duty* in execution of which that right is to be exercised. If he employs those arms, which he ought to wield for the safety and protection of his country, to the annoyance and terror and danger of its citizens, he deserves but the severer condemnation for the abuse of the high privilege with which he has been invested. ''* * *

"It has been remarked that a double-barrel gun, or any other gun, cannot in this country come under the description of 'unusual weapons,' for there is scarcely a man in the community who does not own and occasionally use a gun of some sort. But we do not feel the force of this criticism. A gun is an 'unusual weapon,' wherewith to be armed and clad. No man amongst us carries it about with him, as one of his everyday accoutrements — as a part of his dress — and never, we trust, will the day come when any deadly weapon

will be worn or wielded in our peace-loving and law-abiding State, as an appendage of manly equipment. But although a gun is an 'unusual weapon,' it is to be remembered that the carrying of a gun, *per se,* constitutes no offense. For any lawful purpose — either of business or amusement — the citizen is at perfect liberty to carry his gun. It is the wicked purpose, and the mischievous result, which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm a peaceful people." *Id.* at 420-23.

A different conclusion from that in *State v. Huntley* was reached in *Simpson v. The State of Tennessee,* 5 Yerg. (Tenn.) 356 (1833) wherein it was said that it was no offense at all at common law for a man to go armed in public places with dangerous and unusual weapons when there was no attempt to use them, even though it was alleged to have been done to the terror of the people. In commenting upon the Tennessee case, Clark and Marshall, in their treatise on the Law of Crimes § 428 (5th Ed. 1952), say: "In North Carolina the contrary was held, and this decision (*State v. Huntley, supra*) seems to be supported both by general principles and by authority." *Accord,* 2 Brill, Cyclopedia, Criminal Law § 987 (1923); 3 Wharton's Criminal Law § 1869 (11th Ed., Kerr, 1912).

*State v. Huntley* is still the law of North Carolina. During the past 124 years it has never been criticized. In *State v. Lanier,* 71 N.C. 288, Settle, J., said: "The elementary writers say that the offense of going armed with dangerous or unusual weapons is a crime against the public peace by terrifying the good people of the land, and this Court has declared the same to be the common law in *State v. Huntley,* 25 N.C. 418." *Id.* at 288-89. In *State v. Roten,* 86 N.C. 701, 704, it is written that although the legislature has not forbidden the open wearing of arms, "[i]f the privilege of so wearing arms should be abused, the public is protected by the common law." As authority for this last statement, Ashe, J., the author of the opinion, cited and quoted from *State v. Huntley, supra.* In *State v. Griffin,* 125 N.C. 692, 34 S.E. 513, Clark, J. (later C.J.), cited *State v. Huntley* as authority for his statement that "An affray may be committed by 'going armed with unusual and dangerous weapons, to the terror of the people.'" In *State v. Cole,* 249 N.C. 733, 107 S.E. 2d 732, the defendants were convicted of inciting a riot. The judge instructed the jury that the constitutional guaranty of a citizen's rights to bear arms and assemble peaceably for the purpose of registering their grievances "does not give any individual or any body of individuals, the right to bear arms for unlawful purposes in any respect anywhere." Upon appeal, the defendants assigned this instruction as

error. It was, however, approved upon the authority of *State v. Huntley, supra.*

At the time *State v. Huntley* was decided, the constitutional provision with reference to the right of the people to bear arms was contained in section 17 of the Bill of Rights, which was a part of our Constitution of 1776. It read as follows: "That the people have a right to bear arms for the defence of the state; and as standing armies in time of peace are dangerous to liberty, they ought not to be kept up; and that the military should be kept under strict subordination to, and governed by, the civil power."

In 1868, the above provision was replaced by the first sentence of Art. I § 24 of the present Constitution: "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed; and, as standing armies in time of peace are dangerous to liberty, they ought not to be kept up, and the military should be kept under strict subordination to, and governed by, the civil power." To the foregoing, the Constitutional Convention of 1875 added a second sentence: "Nothing herein contained shall justify the practice of carrying concealed weapons, or prevent the Legislature from enacting penal statutes against said practice."

Defendant in this case makes no contention that Art. I § 24 of our present Constitution abolished the common-law crime of carrying weapons to the terror of the people or that it protects him from Indictment No. 50. Notwithstanding, we now consider whether this revision in the Constitution changed the common law as it existed in this State in 1843.

It is obvious that the second amendment to the Federal Constitution — "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed" — furnished the wording for the first part of the N. C. Constitution, Art. I § 24. Historical data and the reports of the deliberations and discussions which resulted in the wording of the second amendment and similar provisions in the constitutions of the original states lead to the conclusion that the purpose of these declarations (that a well regulated militia is necessary to the security of a free state) was to insure the existence of a state militia as an alternative to a standing army. Such armies were regarded as " 'peculiarly obnoxious in any free government.' " *State v. Kerner,* 181 N.C. 574, 576, 107 S.E. 222, 224. The framers of our constitutions were dedicated to the principle that the military should be kept under the control of civil power. For a full discussion of the history, and a collection of the decisions relating to the right to bear arms in

the United States, see Fuller and Gotting, *The Second Amendment: A Second Look*, 61 Nw. U. L. Rev. 46 (1966).

Militia is defined as "[t]he body of citizens in a state, enrolled for discipline as a military force, but not engaged in actual service except in emergencies, as distinguished from regular troops or a standing army," Black's Law Dictionary, 4th Ed. 1951 N. C. Constitution, Art. 12; G.S. 127-1 *et seq.;* see *Worth v. Commissioners,* 118 N.C. 112, 24 S.E. 778.

At the time constitutional provisions guaranteeing to the people the right to bear arms were formulated, the weapons of the militia were largely the private arms of the individual members; so the right of the people to keep and bear arms was the right to maintain an effective militia. If a citizen could be disarmed, he could not function as a militiaman in the organized militia. Today, of course, the State militia (of which the National Guard is the backbone) is armed by the State government and privately owned weapons do not contribute to its effectiveness. While the purpose of the constitutional guaranty of the right to bear arms was to secure a well regulated militia and not an individual's right to have a weapon in order to exercise his common-law right of self-defense, this latter right was assumed. *Hill v. State of Georgia,* 53 Ga. 472. In any event, the guaranty made the militiaman's arms available to him for that purpose. North Carolina decisions have interpreted our Constitution as guaranteeing the right to bear arms to the people in a collective sense — similar to the concept of a militia — and also to individuals. *Accord, Nunn v. State of Georgia,* 1 Ga. 243 (1846). These decisions have, however, consistently pointed out that the right of individuals to bear arms is not absolute, but is subject to regulation.

In *State v. Kerner,* 181 N.C. 574, 107 S.E. 222 (1921), it was held that a public-local law which prohibited one from carrying a pistol off his premises in Forsyth County without a permit (even though the pistol was not concealed) was unconstitutional. In the opinion, however, Clark, C.J., was careful to point out that an individual's constitutional right to bear arms was subject to reasonable regulation. He said: "It would also be a reasonable regulation, and not an infringement of the right to bear arms, to prohibit the carrying of deadly weapons when under the influence of intoxicating drink, or to a church, polling place, or public assembly, or in a manner calculated to inspire terror, which was forbidden at common law. These from a practical standpoint are mere regulations, and would not infringe upon the object of the constitutional guarantee, which is to preserve to the people the right to acquire and retain a practical knowledge of the use of fire-arms." *Id.* at 578, 107 S.E. at 225.

In a concurring opinion, Allen, J., and Stacy, J. (later C.J.), pointed out that to require a person to secure a permit before taking his gun off his premises — particularly in an emergency — was an unreasonable regulation. They said: "The right to bear arms, which is protected and safeguarded by the Federal and State constitutions, is subject to the authority of the General Assembly, in the exercise of the police power, to regulate, but the regulation must be reasonable and not prohibitive, and must bear a fair relation to the preservation of the public peace and safety." *Id.* at 579, 107 S.E. at 226.

In *State v. Speller,* 86 N.C. 697, 700 (1882), Ruffin, J., posed this question: "But without any constitutional provision whatever on the subject, can it be doubted that the Legislature might by law *regulate* this right to bear arms — as they do all other rights whether inherent or otherwise — and require it to be exercised in a manner conducive to the peace and safety of the public?" Justice Ruffin thought the question answered itself.

In *State v. Reams,* 121 N.C. 556, 557, 27 S.E. 1004, 1005 (1897), this Court held that a pistol which was partly exposed to the public view was not a concealed weapon. Faircloth, C.J., began the opinion as follows: "The Constitution, Art. I, sec. 24, says that 'The right of the public to keep and bear arms shall not be infringed. . . . Nothing herein contained shall justify the practice of carrying concealed weapons or prevent the Legislature from enacting penal statutes against said practice.' The Legislature may then regulate the right to bear arms in a manner conducive to the public peace (*S. v. Speller,* 86 N.C. 697), which it has done in section 1005 of the Code."

North Carolina has not been alone in the view that a citizen's right to carry arms is subject to reasonable regulation. In 1896, in *Commonwealth v. Murphy,* 166 Mass. 171, 44 N.E. 138, the Supreme Judicial Court of Massachusetts was able to say, "[I]t has been almost universally held that the Legislature may regulate and limit the mode of carrying arms." *Id.* at 171, 44 N.E. at 138. In that case, the court held that a statute which forbade unauthorized bodies of men to parade with firearms did not contravene the provision of the Massachusetts Constitution which declared: "The people have a right to keep and bear arms for the common defense." The defendant Murphy, and ten or twelve other men, carrying ordinary breech-loading Springfield rifles, paraded in violation of statute. Their conviction was upheld even though their rifles had been altered so that they would not fire. The court said: "The right to keep and bear arms for the common defense does not include the right to associate together as a military organization, or to drill and parade with arms in cities and towns, unless authorized so to do by law. This is a

STATE *v.* DAWSON.

matter affecting the public security, quiet, and good order, and it is within the police powers of the legislature to regulate the bearing of arms, so as to forbid such unauthorized drills and parades." *Id.* at 171, 44 N.E. at 138.

Insofar as they affect an individual's right to carry arms, we perceive no difference in the constitutional provision of 1776 and our present constitution. The 1875 addendum stating that the legislature may enact penal statutes against carrying concealed weapons was undoubtedly "a matter of superabundant caution, inserted to prevent a doubt, and that, unexpressed, it would result from the undefined police powers, inherent in all governments, and as essential to their existence as any of the muniments of the bill of rights." *Haile v. State,* 38 Ark. 564, 567 (1882). It may have been that the specific reference to concealed weapons was directed at members of the militia who had thus abused their right to bear arms. In any event, it is inconceivable that the Constitutional Convention, which expressed its disapproval of the practice of carrying concealed weapons, intended to legalize acts which had previously been criminal. As the Supreme Court of Georgia said in *Hill v. State of Georgia,* 53 Ga. 472, 477, a case in which it held constitutional a statute prohibiting the carrying of weapons in a court of justice: "The preservation of the public peace, and the protection of the people against violence, are constitutional duties of the legislature, and the guarantee of the right to keep and bear arms is to be understood and construed in connection and in harmony, with these constitutional duties."

The right of a citizen to keep and bear arms is not at issue in this case. The question is whether he has a right to bear arms to the terror of the people. Our decisions make it quite clear that any statute, or construction of a common-law rule, which would amount to a destruction of the right to bear arms would be unconstitutional. But, as the Supreme Court of Alabama declared in *State v. Reid,* 1 Ala. 612, 617, "[A] law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution." Alabama's Constitution provided that "Every citizen has a right to bear arms, in defence of himself and the State."

The 1875 addendum to Art. I § 24 does not license self-appointed vigilantes, extremist groups, hoodlums, or any persons whomsoever to arm themselves for the purpose of intimidating the people and

then — so long as they flaunt those weapons — to roam with impunity to the terror of the people. The right to keep and bear arms no more gives an individual the right to arm himself in order to prowl the highways or other public places to the terror of the people than the constitutional guaranty of free speech gives him the right to yell "fire" in a crowded theater.

Because our citizens are customarily law abiding, prosecutions for the common-law crime of going armed to the terror of the people have been infrequent. Notwithstanding, it is a wise and salutory law. In this day of social upheaval one can perceive only dimly the tragic consequences to the people if either night riders or daytime demonstrators, fanatically convinced of the righteousness of their cause, could legally arm themselves, mass, go abroad, and display their weapons for the purpose of imposing their will upon the people by terror. Such weapons — unconcealed and "ready to be used on every outbreak of ungovernable passion" — would endanger the whole community. *Haile v. State, supra* at 566. The wisdom of the common law, which made it a crime to go armed to the terror of the people, inures to our benefit today.

The indictment in case No. 50, although not as detailed and specific as the charge in *State v. Huntley, supra,* is nevertheless sufficient. *Sir John's* Case, *supra.* See also 3 Wharton's Criminal Law § 1870 (11th Ed. Kerr 1912). It charges all the essential elements of the crime, that is, that defendant (1) armed himself with unusual and dangerous weapons, to wit, pistols and rifles (2) for the unlawful purpose of terrorizing the people of Alamance County, and, (3) thus armed, he went about the public highways of the county (4) in a manner to cause terror to the people. While it would have been proper (as in *Huntley, supra*) to enumerate acts or threats of violence committed by defendant while thus going armed, such specific averments are not required. Evidence of such acts, of course, was admissible as tending to prove the commission of the offense charged.

The State's evidence was sufficient to show that defendant and three others collected an arsenal of dangerous weapons, a carbine and four pistols; that, thus armed, they rode the public highways of Alamance County in the nighttime; that, on different streets, they fired bullets into the store of Ernest Farrington and the homes of Nellie Mae Foust and Sarah Foust. As Gaston, J., said of Huntley's conduct in 1843, it is difficult to imagine facts which "more unequivocally" constitute the common-law misdemeanor of going armed to the terror of the people. Defendant's motion of nonsuit in case No. 50 was properly overruled.

STATE *v.* DAWSON.

The decision is this:
As to case No. 48
Reversed.
As to cases Nos. 49 and 50,
No error.

LAKE, J., concurring in part and dissenting in part.

I concur in the decisions reached in the majority opinion with reference to Bill No. 48 and with reference to Bill No. 49, and with the views expressed therein concerning those two cases.

I dissent from the decision with reference to Bill No. 50. It is my view that the motion to quash that indictment should have been granted for the reason that the indictment does not state a criminal offense under the present law of this State.

The sufficiency of an indictment to withstand a motion to quash turns upon the facts alleged therein and not upon what the evidence shows. The indictment in Case No. 50 is not strengthened by what is alleged and proved in Cases No. 48 and 49. Upon the motion to quash, it must be considered as if there were no Case No. 48 and no Case No. 49. Upon that motion we look solely to the indictment in Case No. 50 and we assume that every fact alleged therein is true and that no other fact whatever is known about this defendant. *State v. Cole,* 202 N.C. 592, 163 S.E. 594; *State v. Whedbee,* 152 N.C. 770, 67 S.E. 60; *State v. Eason,* 70 N.C. 88; 27 Am. Jur., Indictments and Informations, § 54.

The facts alleged in the indictment in Case No. 50 are these:

The defendant and three others "did unlawfully, & wilfully arm themselves with unusual and dangerous weapons, to wit: Pistols and Rifles and, for the wicked and mischievous purpose of terrifying and alarming the citizens of Alamance County, did ride or go about the public highways of Alamance County without lawful excuse armed with said weapons in a manner as would cause terror and annoyance and danger to the citizens of said county."

The majority construes this to allege that the defendant, armed as described, went upon the public highways in a manner to cause terror to the people. I construe the allegation to mean that he went upon the public highways armed in a manner to cause terror to the people. The difference is not a play upon words. The indictment must charge the elements of the offense "lucidly." *State v. Banks,* 263 N.C. 784, 140 S.E. 2d 318. Where it leaves doubt as to what acts are charged, the accusation should be strictly construed. 27 Am. Jur., Indictments and Informations, §§ 54, 57. In my view of the law of this

State, it is quite material whether the defendant is charged with some act while bearing arms upon the highway or with the mere bearing of arms upon the highway. A substantial basis for doubt as to whether the indictment charges an element of a criminal offense should be resolved in favor of the defendant. As the majority opinion notes, this indictment does not allege any act or threat of violence committed by the defendant while going armed upon the highway. Neither does it allege that any person was terrified.

In *State v. Huntley,* 25 N.C. 418, which is cited by the majority and which is the foundation upon which the conclusion of the majority opinion rests, the indictment charged that the armed defendant went upon the highway and, exhibiting himself thereon to the citizens of the county, "did openly and publicly declare a purpose and intent" to murder a named individual and others "by which said arming, exposure, exhibition, and declarations," citizens of the State were terrified and the peace of the State endangered. That is a substantial distinction between the present case and *State v. Huntley.* If these acts of the defendant there were not the basis upon which that case was decided, it is my view that *State v. Huntley* does not correctly represent the present law of this State, even if it did so represent the law of this State in 1843.

The majority opinion correctly states that the opinion in *State v. Huntley* has never been criticised during the 124 years since it was rendered by the great Court composed of Ruffin, C.J., and Gaston and Daniel, JJ. It is possible that this is true because of the fact that, so far as the reports of this Court's decisions show, it has never been applied from that day to this. It is true that there are a few scattered instances in which this Court has cited that case as a correct statement of the common law. I have been able to find only these: *State v. Cole,* 249 N.C. 733, 107 S.E. 2d 732; *State v. Griffin,* 125 N.C. 692, 34 S.E. 513; *State v. Roten,* 86 N.C. 701; *State v. Lanier,* 71 N.C. 288. In none of these was the offense charged that dealt with in *State v. Huntley.* To these might be added *State v. Kerner,* 181 N.C. 574, 107 S.E. 222, in which Clark, C.J., in an opinion concurred in only by one other member of the Court, though the entire Court joined in the result, refers to the common law crime of carrying deadly weapons in a manner calculated to inspire terror. There, too, another offense was charged. *State v. Huntley* cites no instance in which anyone was ever, prior to that date, charged with this offense in North Carolina. No American decision is cited as recognizing the existence of such an offense in this country.

That case, decided by this Court when composed of judges equalled by few and surpassed by none in wisdom or in knowledge of the

common law, establishes that in 1843 the common law of North Carolina made it a criminal offense for one armed with "unusual and dangerous weapons" to go upon the public highway and there, by threats of murder, cause terror to the people. Notwithstanding the eminent authority of the Court which so declared the common law of this State in 1843, I question the correctness of a decision which now sends a man to prison on no basis save that it was so declared in the time of Plantagenet absolutism, the dust gathered upon that declaration having been disturbed but once in all the history of this State.

There is, however, a much better reason for refusing to affirm this defendant's conviction on the ground of *State v. Huntley, supra.* That is, the fact that the present Constitution of this State contains a different provision as to the right of the people of North Carolina to bear arms from that which the Constitution contained in 1843 At that time the Constitution in effect was the one adopted 18 December 1776. In section 44, that original Constitution of North Carolina incorporated into itself the Declaration of Rights adopted the previous day. Section 17 of the Declaration of Rights of 1776 declared "that the people have a right to bear arms *for the defense of the State * * *.*" (Emphasis added.) That provision was quoted by Gaston, J., in *State v. Huntley* and he emphasized in his opinion the fact that the Constitution then so limited this right.

In 1868, our Constitution was rewritten and the language of the Second Amendment to the United States Constitution was substituted for that of the original Constitution relied upon in *State v. Huntley.* That language is, "A well regulated militia being necessary to the security of a free state, the right of the people *to keep and bear arms* shall not be infringed * * *." (Emphasis added.) Seven years later, in the Convention of 1875, this sentence was added: "Nothing herein contained shall justify the practice of carrying concealed weapons, or prevent the Legislature from enacting penal statutes against said practice." It appears indisputable that the Convention of 1875 regarded the then established right of the people to keep and bear arms as absolute, so much so that the Legislature could not even forbid the carrying of a concealed weapon without the express authority being granted to it in the Constitution by amendment.

It is true that in *State v. Speller,* 86 N.C. 697, Ruffin, J., not the Chief Justice of 1843, said in a dictum that the Legislature might by law "regulate this right to bear arms," and the same view is expressed by Allen and Stacy, JJ., in *State v. Kerner, supra,* in which case, as above noted, there was no opinion receiving the approval of the majority of the Court. I am unable to understand how a right can be regulated without being infringed. The language of the present

Constitution appears to be plain and unequivocal. It does not say that the right to bear arms cannot be infringed except for the promotion of peace and good order in the community. It says the right shall not be infringed. It is immaterial whether that is wise or unwise. That is what the Constitution says. The better view on this point seems to be that stated by Clark, C.J., in *State v. Kerner, supra,* as follows:

> "The Constitution of this State, sec. 24, Art. I, which is entitled, 'Declaration of Rights,' provides: 'The right of the people to keep and bear arms shall not be infringed,' adding, 'Nothing herein contained shall justify the practice of carrying concealed weapons, or prevent the Legislature from enacting penal statutes against said practice.' This exception indicates the extent to which the right of the people to bear arms can be restricted; that is, the Legislature can prohibit the carrying of concealed weapons, but no further."

If the Legislature of North Carolina today cannot make conduct a criminal offense, it cannot be punished in this State by reason of the fact that Edward II declared it to be so. It was the very fact that the right to bear arms had been infringed in England, and that this is a step frequently taken by a despotic government, which caused the adoption of the provision in the North Carolina Declaration of Rights of 1776 and the insertion in the Federal Bill of Rights of the Second Amendment. When our distinguished predecessors of 1843 determined that the language used in our State Constitution did not forbid the imprisonment of a man for conduct which Edward III had declared a criminal offense, the people of this State wrote into our Constitution the more inclusive language of the Second Amendment to the Constitution of the United States. Thus, *State v. Huntley, supra,* unless distinguishable from the present case as above suggested, has not been overruled by this Court. It has been overruled by the only authority which is higher than this Court in matters of North Carolina law — the people of North Carolina.

A further quotation from the opinion of Clark, C.J., in *State v. Kerner,* in which opinion Hoke, J., later C.J., concurred, is not inappropriate to the present times:

> "The former [the right to keep and bear arms] is a sacred right, based upon the experience of the ages in order that the people may be accustomed to bear arms and ready to use them for the protection of their liberties or their country when occasion serves. The provision against carrying them concealed was to prevent assassinations or advantages taken by the law-

STATE *v.* DAWSON.

less, *i.e.*, against the abuse of the privilege. \* \* \*

"In our own State, in 1870, when Kirk's militia was turned loose and the writ of *habeas corpus* was suspended, it would have been fatal if our people had been deprived of the right to bear arms, and had been unable to oppose an effective front to the usurpation.

"The maintenance of the right to bear arms is a most essential one to every free people, and should not be whittled down by technical constructions. It should be construed to include all such 'arms' as were in common use, and borne by the people when this provision was adopted. \* \* \* The intention was to embrace 'the arms,' an acquaintance with whose use was necessary for their protection against the usurpation of illegal power — such as rifles, muskets, shotguns, swords, and pistols. \* \* \*

"The usual method when a country is overborne by force is to 'disarm' the people. It is to prevent the above and similar exercises of arbitrary power that the people in creating this Government 'of the people, by the people, and for the people,' reserved to themselves the right to 'bear arms' that accustomed to their use they might be ready to meet illegal force with legal force by adequate and just defense of their persons, their property, and their liberties, whenever necessary. We should be slow, indeed, to construe such guarantee into a mere academic expression which has become obsolete."

When *State v. Huntley* was decided in 1843, it had never been supposed that the Second Amendment to the United States Constitution placed any limit upon the power of the State Government to declare conduct criminal. See Clark, C.J., in *State v. Kerner, supra.* There was then no Fourteenth Amendment. The Supreme Court of the United States has now held that the Fourteenth Amendment makes applicable to state governments all of those provisions of the first ten amendments which are essential to the preservation of liberty. See, *Palko v. Connecticut,* 302 U.S. 319, 326, 58 S. Ct. 149, 82 L. Ed. 288. Whether that Court will so regard the Second Amendment, I am unable to predict. In any event, the same language now in our own State Constitution does forbid the imposition of criminal penalties upon the bearing of arms which are not concealed.

By no means does it follow that one, while bearing arms, may use them as he sees fit. The right to bear arms obviously confers no right to shoot into the dwelling of another. Thus, the conviction of the defendant in Case No. 49 should be affirmed and I concur in the

majority's decision so to do. Likewise, the State has unquestioned power to punish for an assault with a deadly weapon more severely than for a simple assault, G.S. 14-33, and to impose for armed robbery a sentence more severe than that imposed for common law robbery. G.S. 14-87. To stand in a public highway brandishing a pistol while threatening to murder, as was done in *State v. Huntley,* may be punished by the State. To incite to riot is punishable. *State v. Cole,* 249 N.C. 733, 107 S.E. 2d 732. To refer to the case of Sir John Knight, cited in the majority opinion, if some modern counterpart of Sir John invades a church in this State while Divine services are in progress, waving a gun and terrifying the congregation, as Sir John is said to have done in England, he may be punished for disturbing public worship if not for an assault with a deadly weapon. It is not necessary to dust off Edward III's statute of Northampton, 2 Edward III, ch. 3, in order to protect the people of this State from the misuse of firearms or other weapons. However, the mere carrying of weapons upon the public highway, without some act other than the carrying of them, cannot be made a crime under the Constitution of this State, even though the sight of the weapons frightens some person or persons; nor is it sufficient to make the bearing of weapons a criminal offense that the bearer intended to frighten someone thereby. So long as a man does only that which the Constitution declares he has an uninfringeable right to do, he cannot be convicted and punished whatever his motive or purpose for doing it may be and whatever the effect of it may be upon other people. Until some act, other than the mere carrying of the weapon is done, the Constitution of the State protects the bearer of the weapon from punishment by the State.

In the present indictment in Case No. 50, as I interpret it, the defendant is charged only with carrying weapons on the highway, not with any other act. For this reason the indictment does not state a criminal offense and the motion to quash should have been allowed.

HIGGINS, J., authorizes me to say he concurs in the views here expressed and joins in this opinion.