STATE OF NORTH CAROLINA v. PRESTON EUGENE DOBBINS

No. 57

(Filed 20 January 1971)

1. **Riot and Inciting to Riot § 1; Municipal Corporations § 33— violation of municipal curfew — authority of the mayor to declare curfew.**

   In a prosecution on a warrant charging defendant with the violation of a municipal emergency curfew ordinance, there was ample evidence to support the findings and conclusions of the trial court (1) that the mayor was acting within the scope of his authority in declaring the temporary, city-wide curfew and (2) that the mayor's proclamation of a state of emergency was not arbitrary and did not violate any right of defendant under the State and Federal Constitutions.

2. **Municipal Corporations § 33— right to travel on city streets — nature and extent of the right**

   The right of an individual to travel upon the public streets of a city is not absolute but may be regulated, as to the time and manner of its exercise, when reasonably deemed necessary to the public safety, by laws reasonably adapted to the attainment of that objective.

3. **Constitutional Law § 11— scope of the police power**

   The police power of the State extends to all the compelling needs of the public health, safety, morals and general welfare.

4. **Constitutional Law §§ 17, 23— due process — extent and scope**

   The liberty protected by the Due Process and Law of the Land Clauses of the Federal and State Constitutions extends to all fundamental rights of the individual.

5. **Constitutional Law § 18— restraint on First Amendment freedoms— exercise of police powers**

   Even as to those major segments of individual liberty expressly protected from Federal restraint by the First Amendment to the U. S. Constitution, governmental protection of the public safety from present excesses of direct, active conduct are not presumptively bad.

6. **Municipal Corporations § 33; Constitutional Law § 17— right to travel on the public streets — scope of restrictions**

   The right to travel on the public streets is a fundamental segment of liberty, and the absolute prohibition of such travel requires substantially more justification than its regulation by traffic lights and rules of the road.

7. **Municipal Corporations § 33— prohibition upon travel — municipality faced with violent upheaval**

   A municipality that was faced with a clear and present danger of violent upheaval accompanied by widespread destruction of property and personal injury was not prevented by either the State or Federal Constitutions from imposing a temporary prohibition upon travel. U. S. Constitution, Amendment XIV; N. C. Constitution, Art. I, § 17.

State v. Dobbins

8. **Municipal Corporations § 33— imposition of city-wide curfew — restrictions on defendant's right of travel**

The imposition of a temporary, city-wide curfew did not violate defendant's right to travel upon the streets of the city, where the curfew was imposed in response to a clear and present danger of violent upheaval by the lawless portion of the citizenry.

9. **Constitutional Law §§ 11, 18— police power of the State — restrictions on travel**

The police power of the State is broad enough to sustain the promulgation and fair enforcement of laws designed to restore the right of safe travel by temporarily restricting all travel, other than necessary movement reasonably excepted from the prohibition.

10. **Municipal Corporations § 33; Riot and Inciting to Riot § 1— imposition of municipal curfew — clear and present danger test**

In imposing a curfew, the city authorities are not required to delay such action until fires have been ignited and rioting has commenced; all that is required is the existence of a clear and present danger of such disastrous and unlawful conduct.

11. **Municipal Corporations § 29— police power**

A municipality has no inherent police power.

12. **Municipal Corporations § 29— emergency power of municipality to prohibit movement of people**

A municipality has the delegated authority to enact an ordinance prohibiting the movement of people in public places during a state of emergency. G.S. 14-288.1(10); G.S. 14-288.12.

13. **Municipal Corporations §§ 29, 33; Riot and Inciting to Riot § 1— statutory authority of city to restrict travel — constitutionality of statute**

The statute authorizing a municipality to enact an ordinance giving the mayor authority to determine and proclaim a state of emergency and to impose restrictions upon travel, *held* not unconstitutional for vagueness. G.S. 14-288.1(10); G.S. 14-288.12.

14. **Arrest and Bail § 3; Municipal Corporations § 33— arrest without warrant — violation of municipal curfew**

Arrest of defendant without a warrant for the violation of a municipal curfew ordinance was lawful, since the presence of defendant and his companion upon the city streets while the curfew was in effect furnished the arresting officer with reasonable ground to believe that the defendant had committed a misdemeanor in his presence.

15. **Searches and Seizures § 1; Criminal Law § 84— search incident to lawful arrest — admissibility of articles discovered**

The search of defendant's person immediately following his lawful arrest for the violation of a municipal curfew was incidental to such arrest; consequently, the four shotgun shells found tucked in the tops of his boots were properly admitted in evidence.

State v. Dobbins

16. Searches and Seizures § 1; Criminal Law § 84— warrantless seizure of gun butt — admissibility of gun butt in evidence

A highway patrolman who stood outside defendant's automobile and saw by the street light two inches of a gun butt protruding from papers on the floor of the back seat had authority to take the gun butt into his possession without the necessity of obtaining a warrant; the gun butt was properly admitted in evidence during defendant's trial on charges of violating a municipal curfew and of having unlawful possession of a dangerous weapon in an area in which a declared state of emergency existed.

17. Searches and Seizures § 1; Criminal Law § 84— seizure of partly concealed gun butt — wholly concealed gun barrel

Where a highway patrolman saw a gun butt that was lying partly concealed under papers in the floor of defendant's car and, in removing the gun butt from the car, the patrolman struck a gun barrel wholly concealed beneath the papers, the subsequent uncovering and removal of the gun barrel from the car was a mere continuation of the lawful removal of the gun butt and did not constitute an unreasonable search forbidden by the Fourth and Fourteenth Amendments of the U. S. Constitution; consequently, admission of the gun barrel in evidence was without error.

18. Riot and Inciting to Riot § 2; Municipal Corporations § 33— violation of municipal curfew ordinance — burden of proving exception to the ordinance

In a prosecution charging defendant with the violation of a municipal curfew ordinance, the State did not have the burden to prove that defendant's presence on the streets was for a purpose other than those excepted by the ordinance.

19. Municipal Corporations § 33; Riot and Inciting to Riot § 2— violation of municipal curfew ordinance — sufficiency of evidence

In a prosecution charging defendant with the violation of a municipal curfew ordinance, evidence of the defendant's unexplained presence on the streets was sufficient to establish proof of the defendant's violation of the ordinance.

20. Weapons and Firearms— unlawful possession of weapon in emergency area — sufficiency of evidence

In a prosecution charging defendant with the unlawful possession of a dangerous weapon in an area in which a declared state of emergency existed, evidence of the State was sufficient to withstand defendant's motion for nonsuit, where there was evidence that (1) a curfew had been declared in a municipality; (2) the defendant was stopped while riding through the streets of the municipality; and (3) a gun butt and a detached gun barrel were lying on the floor of the back seat, and shotgun shells were stuck in defendant's boot tops.

21. Weapons and Firearms— unlawful possession of dangerous weapon in an area of emergency — validity of sentencing

In a prosecution charging defendant with the unlawful possession of a dangerous weapon in an area in which a declared state of emer-

gency existed, the sentencing of defendant to six months in the county jail, the sentence being suspended and the defendant placed on probation for three years, *held* lawful. G.S. 14-288.7(c).

**22. Criminal Law § 92; Weapons and Firearms — consolidation of offenses for trial**

Warrants charging defendant with the violation of a municipal curfew and with the unlawful possession of a dangerous weapon in an area in which a declared state of emergency existed, *held* properly consolidated for trial, where both offenses arose out of the same occurrence, and the same evidence was competent and admissible in the trial of both offenses. G.S. 15-152.

**23. Criminal Law § 88— cross-examination of defendant — defendant's request that the examination be limited**

In a prosecution charging defendant with the violation of a municipal curfew ordinance and with the unlawful possession of a dangerous weapon in an area in which a declared state of emergency existed, the trial court properly denied defendant's request that, if he elected to take the stand and testify with reference to the curfew violation only, the State be limited in its cross-examination to that matter and not be permitted to cross-examine him concerning his possession of a disassembled shotgun and some shotgun shells.

**24. Riot and Inciting to Riot § 2; Municipal Corporations § 33— violation of municipal curfew — instructions**

In a prosecution charging defendant with the violation of a municipal curfew ordinance, the trial court was not required to read to the jury, as part of the charge, the section of the ordinance relating to the mayor's authority to prohibit travel upon the public streets except by those so traveling for specified purposes, where there was no evidence purporting to bring the defendant within any exception to the ordinance or otherwise to justify his presence upon the street at the time of his arrest.

**25. Appeal and Error § 4— review of constitutional questions — question not raised on trial**

The Supreme Court will not pass upon a constitutional question unless it affirmatively appears that such question was raised and passed upon in the trial court, if it could have been raised therein.

Justice MOORE did not participate in the consideration or decision of this case.

APPEAL by defendant from the judgment of the Court of Appeals, reported in 9 N.C. App. 452.

At the 19 January 1970 Session of BUNCOMBE Superior Court, the defendant was tried on two separate warrants charging: (1) Wilful and unlawful possession off his own premises of a dangerous weapon, to wit, a 12-gauge shotgun and shells,

in an area in which a declared emergency existed, in violation of G.S. 14-288.7; and (2) violation of an emergency curfew ordinance of the City of Asheville by being on a public street in the city between the hours of 9 p.m. and 6 a.m. He was found guilty of both offenses. Upon the first charge, he was sentenced to six months in the county jail but the sentence was suspended and he was placed on probation for three years. On the second charge, he was fined $25.00. From both judgments he appealed.

On 27 February 1969, the City Council of Asheville adopted Ordinance No. 613. The ordinance provides:

"A state of emergency shall be deemed to exist whenever, during times of great public crisis, disaster, rioting, catastrophe, or similar public emergency, for any reason, municipal public safety authorities are unable to maintain public order or afford adequate protection for lives or property."

The ordinance authorizes the Mayor of the City to issue a public proclamation declaring the existence of a state of emergency and placing in effect certain restrictions "in the event of an existing or threatened state of emergency endangering the lives, safety, health and welfare of the people within the City of Asheville, or threatening damage to or destruction of property."

Restrictions which the Mayor is authorized by the ordinance to impose during such proclaimed emergency include: (1) Prohibition of the possession off one's own premises of explosives, firearms, ammunition, or dangerous weapons of any kind; and (2) prohibition or regulation of travel upon any public street except by those traveling for specified purposes.

The ordinance provides that it shall be unlawful for any person to violate any restriction so imposed during the existence of a proclaimed state of emergency and such violation shall be a misdemeanor punishable by a fine not exceeding $50.00 or by imprisonment not exceeding 30 days.

At 3 p.m. on 29 September 1969, the Mayor issued a proclamation, effective immediately, providing that it would remain in effect until dissolved by him or by the City Council. The proclamation recited the adoption of the above mentioned ordinance and that "certain unknown persons, by various and sundry illegal acts, have attempted and are now attempting to interfere

with and disrupt normal activities of this City and a great danger exists, both as to persons and property, as a result of the illegal acts of these unknown persons." It proclaimed the existence of a state of emergency within the City of Asheville and declared that until such state of emergency ended "it shall be unlawful for any person to possess off their own premises * * * any explosive, firearms, gunpowder, ammunition or dangerous weapons of any kind." It further declared that any violation of the proclamation during the existence of such state of emergency would be unlawful and punishable, upon conviction, by a fine not exceeding $50.00 or by imprisonment for a term not exceeding 30 days.

At 4:30 p.m. on the same day, the Mayor issued another proclamation reciting the earlier proclamation of a state of emergency and directing all persons "from and after 9 p.m. on this the 29th day of September 1969, to observe a curfew and remain in their homes, offices or businesses during the hours from 9 p.m. o'clock to 6 a.m. o'clock until such time as this proclamation shall be dissolved by the Mayor * * * or City Council * * * said curfew to continue from day to day, subject to the exemptions hereinafter set forth." This proclamation declared that any violation of it would be punishable, upon conviction, by a fine not exceeding $50.00 or by imprisonment for a term not exceeding 30 days.

A like proclamation was issued by the Mayor at 5 p.m. on 30 September 1969 and another like proclamation at 4 p.m. on 1 October 1969. On 2 October 1969, the Mayor, declaring, "It now appears that the cause of danger to the citizens of the City of Asheville has decreased and that the curfew is no longer necessary to the safety and welfare of our citizens," directed that "the curfew imposed upon the 29th day of September, 1969 by proclamation is herein and hereby rescinded."

Evidence for the State, in addition to the above mentioned ordinance and proclamations, consisted of the stock or butt of a shotgun, a barrel of a twelve-gauge shotgun, fitting the butt, five twelve-gauge shotgun shells, loaded with No. 9 shot, and the testimony of a State Highway patrolman and four city police officers.

The substance of the testimony of these officers was:

At approximately 11:10 p.m. on 30 September 1969, High-way Patrolman Jennings and other officers were on duty at a check point at a street intersection in the City of Asheville known as Six Points. A 1968 Mustang, owned by the defendant and driven by Victor Chalk, Jr., approached the intersection, made a right turn onto another street and then stopped for a stop sign. Patrolman Jennings approached the automobile on the driver's side. The defendant was riding as a passenger in the front seat. No one else was in the car.

Patrolman Jennings asked Chalk to exhibit his driver's license and requested Chalk and the defendant to get out of the car. Chalk got out first. When he did so, Patrolman Jennings, standing outside the automobile, was able to look into it and, by means of the street lights, could see upon the floor of the back seat about two inches of the stock or butt of a shotgun protruding from beneath some papers. The defendant was still seated in the right of the two front bucket seats of the car, from which posi-tion he could reach the back floor by reaching through the open space between the two front seats. Patrolman Jennings pulled the butt of the shotgun out of the car at that time. He noticed it struck something on the floor with a clanging noise of metal striking metal.

Patrolman Jennings placed Chalk under arrest and turned him over to the custody of Police Officer Simmons. Patrolman Jennings then went around to the other side of the automobile, opened the door and requested the defendant to get out, which he did. The defendant was then arrested for curfew violation and, with Chalk, was turned over to the custody of Sergeant Cook of the City Police Force. Again looking in the back of the car beneath the papers on the floor, Patrolman Jennings found the barrel of a twelve-gauge shotgun, which he removed from the car. He fitted the barrel onto the butt of the gun and de-livered both to Sergeant Cook. These two portions of the shotgun are among the State's exhibits above mentioned.

When Patrolman Jennings first asked Chalk for his driver's license, prior to Chalk's getting out of the car and the discovery of the gun butt, he inquired as to why Chalk was "out that night." Chalk replied that "he was afraid they were going to burn his mother's home and he was going to assist her." In addition to the butt and barrel of the shotgun, a length of iron

pipe was lying on the papers on the floor in the back of the car. The firing mechanism of the shotgun was in good working order.

Police Officer Simmons also approached the car and shined his flashlight into it to see what the defendant, then still in the car, was doing. With this he observed a twelve-gauge shotgun shell lying on the back seat, which shell he then took from the car. The defendant and Chalk were then carried to the police station. Sergeant Cook rode with them in the back seat of the police car. During this ride, which took approximately five minutes, nothing was passed from Chalk to the defendant. After they were booked at the police station, Sergeant Cook searched the defendant and found four other twelve-gauge shotgun shells, two in each of his socks, stuck down into the top of his ankle-high boots. The five shells are among the State's exhibits above mentioned.

Prior to the commencement of the trial, the defendant moved to suppress the evidence of the shotgun parts and shells taken from the car, contending that these were fruits of an illegal search without a search warrant. (He also objected at the trial to their introduction in evidence and to the testimony relating to the finding of these articles.) Thereupon, in the absence of the jury, Patrolman Jennings was examined with reference to his discovery of these articles. His testimony on this *voir dire* examination was substantially the same as his subsequent testimony before the jury, above summarized. He took the shotgun butt from the car before any other officer approached the vehicle. The defendant was then seated in the car. Chalk was standing outside the vehicle. Both Chalk and the defendant had gotten out of the car and were standing some 20 feet therefrom, in the custody of Officers Simmons and Cook, when Patrolman Jennings found the barrel of the shotgun under the papers on the floor of the car and removed it therefrom. The motion to suppress the evidence was overruled and Patrolman Jennings thereafter testified in the presence of the jury as above stated.

Over objection by the defendant, the two cases against him were consolidated for trial. At the trial, upon the conclusion of the State's evidence, the defendant requested that he be permitted to take the witness stand to testify concerning "his presence in the curfew and that question only and the cross-exami-

---

State v. Dobbins

---

nation be limited to that." The trial judge refused to so limit the State's right of cross-examination if the defendant took the stand as a witness in his own behalf. Thereupon, the defendant elected not to testify and offered no evidence.

Prior to trial, the defendant moved to quash both warrants on the ground that the proclamation of the curfew was invalid. He contended that no actual state of emergency existed when the curfew was proclaimed. For this reason, he contended, the proclamation of a state of emergency and the proclamation of the curfew were arbitrary and denied the defendant his rights in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. A further ground for the motion to quash was that the North Carolina statute, pursuant to which the city ordinance was passed and the state of emergency and the curfew were proclaimed, is unconstitutional because vague and over-broad and because it fails to set forth any objective standards under which a city may declare a state of emergency. For these reasons, the defendant contended that the statute violated his rights under the First, Fourth, Ninth and Fourteenth Amendments to the Constitution of the United States and Article I, § 17, of the Constitution of North Carolina.

Prior to trial, and in the absence of the jury, the court conducted a hearing with reference to the motion to quash. At this hearing, the defendant's evidence consisted of the testimony of Mayor Montgomery. That of the State consisted of the testimony of the Sheriff of Buncombe County, the Chief of Police and the Assistant Chief of Police of the City, the City Manager and the news director of the Asheville Radio Station. At the conclusion of the hearing, the court denied the motion to quash, making detailed findings of fact, amply supported by the evidence, and summarized as follows (numbering revised):

1. On 29 September 1969, at approximately 11 a.m. o'clock, a confrontation took place at Asheville High School between officials of the school and a large group of students. The students were presenting grievances concerning alleged infractions of their rights and were not attending classes. The school officials requested the students engaged in this process to disperse, which they refused to do. The school officials thereupon requested assistance from the Police Department of the city in restoring order on the school premises.

State v. Dobbins

2. In response to this request, police officers were dispatched to the school premises. Prior to the arrival of the police, the City Manager had been in conference with the school officials on the school premises for approximately an hour. Upon arrival at the school, the commander of the police contingent requested the students to disperse. A majority of them did so, but others remained and the police officers were then directed to disperse them. Thereupon, a further confrontation occurred between these students and the police officers, resulting in numerous personal injuries, both to the police officers and to the students, and in extensive destruction of school property, the overturning of an automobile on the school premises, the throwing of rocks and general turmoil on the premises.

3. Immediately following this confrontation, the Mayor went in person to the Asheville High School and observed the damage to property and the emotional disturbance of persons still present at the scene. The Mayor then proceeded to another high school where students had congregated. There he observed law enforcement personnel on the school premises, no personal injury or property damage having taken place at that school.

4. Thereupon, a special meeting of the Community Relations Council, a recently formed organization, was convened, the Mayor being present. A large crowd attended the meeting. The Mayor observed emotional upset prevalent in the crowd and heard threats made by persons, whom the Mayor deemed otherwise responsible leaders of their community, to the effect that unless the demands of the complainants were met the complainants would burn the city.

5. The Mayor, a doctor of medicine, inquired in local hospitals and was informed concerning injuries sustained by various persons during the above events.

6. The Mayor also attended another meeting at the Urban Renewal Office, approximately one mile from the Asheville High School, where there was a conference with 20 or 30 students. The tenor of this meeting was "less than cordial" and the implication was that unless demands of the students were met, "dire results would be invoked upon the property of the City of Asheville."

7. Because of the above confrontations some of the schools of the city were closed.

8. The Mayor then conferred with the Police Department. He was advised by the police of other violations of the law, such as the throwing of rocks at police vehicles and at vehicles of travelers upon local streets of the city, the striking of police cars with bricks and rocks, the infliction of property damage and personal injury, and the making at various meetings of threats to damage the property of the city.

Upon these findings, the judge concluded that the Mayor was acting within the scope of the power conferred upon him by the ordinance, in accordance with G.S. 14-288.1 through G.S. 14-288.19. The court further concluded that the Mayor's proclamation of a state of emergency was not arbitrary and violated no right of the defendant under the Constitution of the United States or under the Constitution of North Carolina.

In a separate order, the court denied the motion to quash the warrants made on the ground that G.S. 14-288.1 through G.S. 14-288.19 are unconstitutional.

At the hearing of the motion to quash the warrants, the Mayor testified that the above confrontation, inspection of damage to school property, meetings attended by him and conferences with police officers occurred on 29 September and that his decision to proclaim the existence of a state of emergency was based upon his own observation and upon the advice of the law enforcement officials. He further testified that, prior to his issuance of the second curfew proclamation on 30 September, he had been advised of no additional property damage or personal injuries, but he had again had a meeting with the Chief of Police of the City, the Sheriff of the County, officers of the State Highway Patrol, the FBI representatives, the SBI representatives, the United States Attorney, the United States Marshal, the ATU representative and the City Manager. Based on this conference and on the experience and opinions of these law enforcement officers, it was his own opinion that the curfew was still necessary on 30 September and so he issued the second curfew proclamation.

The Mayor further testified that, at the meeting of the Community Relations Council on 29 September, which was attended by a crowd which overflowed the conference room, there were threats to burn the community from both students and adults whom he would consider of normal faculties but

emotionally upset. This meeting lasted approximately an hour, with many people expressing themselves. "The tone was always the same with regard to what had happened to them physically at the school, what would happen to the city if certain conditions were not brought about."

At the time the Mayor proclaimed a state of emergency in the city on 29 September, the Governor of the State had dispatched approximately 15 special State Highway Patrol officers to the city on account of these conditions.

On the night of 30 September (the night the defendant and Chalk were arrested), at least one person was arrested and charged with possession of a fire bomb. The Chief of Police of the City recommended to the Mayor that a curfew be imposed on the night of 30 September.

On 29 September, rocks were thrown at the automobile of the Sheriff of the County, the radio antenna was jerked from his car and other damage was done to it by an assembled crowd at the intersection of Southside and Ashland Streets following the incident at the Asheville High School.

In the Court of Appeals, the defendant assigned as error: (1) The denial of his motion to quash, based upon the unconstitutionality of the proclamation of the state of emergency and the proclamation of the curfew; (2) the denial of his motion to quash, based upon the unconstitutionality of G.S. 14-288.1 to G.S. 14-288.19; (3) the admission in evidence of the parts of the shotgun and of the shotgun shells and of the testimony relating to their discovery; (4) the consolidation of the two cases for trial and the refusal to allow his request to curtail the cross-examination of the defendant, if he elected to testify on the charge of curfew violation only; (5) the denial of the defendant's motion for judgment of nonsuit; and (6) the refusal of the trial court, when requested by the defendant, to include in his charge to the jury a reading of a portion of the ordinance of the city above mentioned.

The Court of Appeals found no merit in any of these assignments of error and affirmed the judgment of the Superior Court. In his present appeal, the defendant asserts the same assignments of error.

*Attorney General Morgan, Assistant Attorney General Melvin and Assistant Attorney General Costen for the State.*

*Chambers, Stein, Ferguson and Lanning, by James E. Ferguson II, and Robert Harrell for defendant.*

LAKE, Justice.

**[1]** Each of the findings of fact made by the Superior Court at the hearing upon the motion to quash the warrant is amply supported by evidence. There is not a shred of evidence to the contrary. It is quite clear that at 3 p.m. on 29 September 1969, the City of Asheville was faced with an imminent threat of widespread burning and other destruction of property, public and private. Emotional tension was prevalent. Tragic experiences in other cities across the nation were a reminder that, if those who threatened the destruction of property began to carry out that threat, violence would probably erupt throughout the city, resulting in numerous personal injuries and much bloodshed. The danger was clear and present, the time remaining for preventive measures a matter of hours. Under these circumstances, the contention of the defendant, that the Constitution of the United States and the Constitution of North Carolina forbid the city authorities to declare a state of emergency and to proclaim and enforce a temporary, night-to-night, city-wide curfew, with specified exceptions for emergency and necessary travel, is patently without support either in authority or logic.

The fact that, during the three nights in which this curfew was in effect, there was no such destruction and violence in the city does not support the defendant's assertion that the proclamation of the curfew was unnecessary and was an unreasonable restraint upon the liberty of the people of the city, including the defendant. On the contrary, it is an indication that Mayor Montgomery, a doctor, exercised sound judgment and prescribed an effective preventive measure. This experience of the City of Asheville is further evidence supporting the view that the danger to the public safety from conditions, such as existed in the city during the afternoon of 29 September, rises to a peak with the arrival of darkness and then subsides quickly in the face of resolute declarations of policy by the city administration and firm, fair enforcement of the applicable laws by an efficient police force. Experience in other cities also has demonstrated

the efficiency of a preventive curfew promptly imposed. See: "Judicial Control of the Riot Curfew," 77 Yale Law Journal 1560, 1568; "Legislation and Riot," 35 Brooklyn Law Review 472, 479. In this instance, the City of Asheville was fortunate in having the effective preventive medicine prescribed and administered promptly.

[2] Of course, the right to travel upon the public streets of a city is a part of every individual's liberty, protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and by the Law of the Land Clause, Article I, § 17, of the Constitution of North Carolina. The familiar traffic light is, however, an ever present reminder that this segment of liberty is not absolute. It may be regulated, as to the time and manner of its exercise, when reasonably deemed necessary to the public safety, by laws reasonably adapted to the attainment of that objective. The constitutional protection of the freedom of travel "does not mean that areas ravaged by flood, fire or pestilence cannot be quarantined when it can be demonstrated that unlimited travel to the area would directly and materially interfere with the safety and welfare of the area." *Zemel v. Rusk*, 381 U.S. 1, 15, 85 S.Ct. 1271, 1280, 14 L.Ed. 2d 179, 189. The statement in *Kent v. Dulles*, 257 U.S. 116, 78 S.Ct. 1113, 2 L.Ed. 2d 1204. "The right to travel is a part of the 'liberty' of which the citizen cannot be deprived *without due process of law* under the Fifth Amendment," (emphasis added) recognizes that this is a right which can be restricted with due process of law. See, *Zemel v. Rusk, supra*. The Zemel and Kent cases involved the right to a passport for international travel and were applications of the Fifth Amendment rather than the Fourteenth. However, these principles, there stated, apply also to the effect of the Fourteenth Amendment upon state imposed restraints on intracity travel.

[3, 4] The police power of the State extends to all the compelling needs of the public health, safety, morals and general welfare. Likewise, the liberty protected by the Due Process and Law of the Land Clauses of the Federal and State Constitutions extends to all fundamental rights of the individual. It is the function of the courts to establish the location of the dividing line between the two by the process of locating many separate points on either side of the line. So long as this Court sits, it will be engaged in that process, but it is not necessary or appro-

State v. Dobbins

priate in the present instance to attempt to draw sharply, throughout its entire length, the line between the right of the individual to travel and the authority of the State to limit travel. It is sufficient, for the present, to hold, as we do, that the Asheville curfew proclamation falls well over on the side of reasonable restriction.

[5] Even as to those major segments of individual liberty, expressly protected from Federal restraint by the First Amendment to the Constitution of the United States, governmental protection of the public safety "from present excesses of direct, active conduct, are not presumptively bad." American Communications Association, *C.I.O. v. Douds,* 339 U.S. 382, 399, 70 S.Ct. 674, 94 L.Ed. 925, 944. As Mr. Justice Brandeis said, concurring in *Whitney v. California,* 274 U.S. 357, 373, 47 S.Ct. 641, 71 L.Ed. 1095, 1105:

"Thus all fundamental rights comprised within the term 'liberty' are protected by the Federal Constitution from invasion by the States. The right of free speech, the right to teach, and the right of assembly are, of course, fundamental rights. * * * These may not be denied or abridged. But, although the rights of free speech and assembly are fundamental, they are not in their nature absolute. Their exercise is subject to restriction, if the particular restriction proposed is required in order to protect the State from destruction or from serious injury, political, economic or moral."

In *West Coast Hotel v. Parrish,* 300 U.S. 379, 391, 57 S.Ct. 578, 81 L.Ed. 703, 708, Mr. Chief Justice Hughes, speaking for the Court, said:

"Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process."

[6] The defendant contends that the right to travel is related to the First Amendment freedoms of speech, assembly and re-

ligion. If so, this does not render it immune to restriction by State law, reasonably necessary for the protection of the public safety in view of prevailing conditions and reasonably calculated to promote such safety under those conditions. Of course, the right to travel on the public streets is a fundamental segment of liberty and, of course, the absolute prohibition of such travel requires substantially more justification than the regulation of it by traffic lights and rules of the road.

[7]    We do not have before us a prolonged curfew, imposed by an unduly fearful or arbitrary official upon a serene and peaceful city engaged in its normal pursuits. We have before us a temporary prohibition of travel in a city faced with a clear and present danger of violent upheaval, accompanied by widespread destruction of property and personal injury. To prevent, control and terminate such an upheaval is the primary function of government. Neither the Fourteenth Amendment nor Article I, § 17, of the State Constitution prevents the City Government of Asheville from discharging this duty owed by it to the people of the city.

[8, 9]    The ultimate cause of the restraint upon this fundamental freedom of the law abiding citizens of Asheville was not the city government, but the arrogantly lawless portion of the people, who threatened the city with destruction if their demands were not met. In this situation, the reasonableness or unreasonableness of those demands is immaterial. The police power of the State is broad enough to sustain the promulgation and fair enforcement of laws designed to restore the right of safe travel by temporarily restricting all travel, other than necessary movement reasonably excepted from the prohibition. As the Supreme Court of Wisconsin said, in *Ervin v. State*, 41 Wis. 2d 194, 163 N.W. 2d 207:

> "Whatever the cause, given the fact of widespread riotous conditions and criminal activities, the restoration of 'domestic tranquility' becomes, not alone a constitutional right, but a constitutional obligation. The temporary imposition of a curfew, limited in time and reasonably made necessary by conditions prevailing, is a legitimate and proper exercise of the police power of public authority."

[10]    Neither the Constitution of the United States nor the Constitution of this State requires the city authorities to delay such

action until fires have been ignited and rioting has commenced. All that is required is the existence of a clear and present danger of such disastrous and unlawful conduct. This condition existed in Asheville when the curfew here in question was proclaimed, according to the record before us.

The defendant does not suggest that the curfew was not fairly enforced in Asheville. The officer, who approached his vehicle, inquired as to the reason for the presence on the street of the defendant and his driver. Such inquiry was proper in order to determine whether these individuals were traveling for an excepted purpose. The officer was not bound to accept as true the response of the driver, especially after observing the butt of a gun protruding from papers on the floor of the back seat, easily within the reach of the defendant.

[11, 12]   The City of Asheville has no inherent police power, *Town of Conover v. Jolly,* 277 N.C. 439, 177 S.E. 2d 879; *State v. Furio,* 267 N.C. 353, 148 S.E. 2d 275; *State v. Byrd,* 259 N.C. 141, 130 S.E. 2d 55; G.S. 160-1. However, by G.S. 14-288.12, the State has delegated this portion of its police power to its municipalities. This statute authorizes the city to enact an ordinance, such as the one here involved, prohibiting the movement of people in public places "during a state of emergency" as defined in G.S. 14-288.1(10). It provides that such ordinance may delegate to the mayor the authority to determine and proclaim the existence of such state of emergency and to impose such restriction upon travel "appropriate at a particular time."

[13]   The statute provides that it is intended to supplement and confirm authority conferred upon municipalities by other statutes "to enact ordinances for the protection of the public health and safety in times of riot or other grave civil disturbance or emergency." The "state of emergency" which is the condition precedent to the exercise of this power by the city is defined as "the condition that exists whenever, during times of public crisis, disaster, rioting, catastrophe, or similar public emergency, public safety authorities are unable to maintain public order or afford adequate protection for lives or property, *or whenever the occurrence of any such condition is imminent.*" (Emphasis added.) The defendant's contention that this statute is unconstitutionally vague, in that it fails to provide a standard for the exercise of the discretion conferred, is clearly without merit.

The ordinance of the City of Asheville establishes the same standard for the guidance of the Mayor in determining the existence of a state of emergency. The Mayor acted in compliance with the prescribed standard. Thus, the police power of the State was properly exercised in the proclamation of the state of emergency and in the proclamation of the curfew presently before us.

[14, 15] The presence of the defendant and his driver upon the streets, while the curfew was in effect, was a violation of the ordinance, declared thereby to be a misdemeanor, unless they were traveling for an excepted purpose. The arresting officer having, at least, reasonable ground to believe that the defendant had committed a misdemeanor in his presence, the arrest without a warrant was lawful. G.S. 15-41. The search of the defendant's person was incidental to such arrest and, consequently, the four shotgun shells, found tucked in the tops of his boots, were properly admitted in evidence. *State v. Roberts,* 276 N.C. 98, 171 S.E. 2d 440; *State v. Tippett,* 270 N.C. 588, 155 S.E. 2d 269; *State v. Haney,* 263 N.C. 816, 140 S.E. 2d 544.

G.S. 14-288.7 makes it a misdemeanor for any person "to transport or possess off his own premises any dangerous weapon or substance in any area: (1) In which a declared state of emergency exists." G.S. 14-288.1 (2) defines "Dangerous Weapon or Substance" to mean "Any deadly weapon, *ammunition* * * * or any instrument or substance designed for use that carries a threat of serious bodily injury or destruction of property; or any instrument or substance that is capable of being used to inflict serious bodily injury, when the circumstances indicate a probability that such instrument or substance will be so used; or *any part* or ingredient in any instrument or substance included above, when the circumstances indicate a probability that such part or ingredient will be so used." (Emphasis added.)

[16] When the defendant's driver got out of the car, the highway patrolman, standing outside the vehicle, could see by the street lights two inches of a gun butt protruding from papers on the floor of the back seat. The contention of the defendant that this was not enough of the article to enable the highway patrolman to identify it as the butt of a gun cannot be taken seriously. Surely a member of the State Highway Patrol is as familiar with the appearance of such objects as is a normal ten year old boy. Seeing this object, imperfectly concealed within easy reach of the defendant, who was still seated in the car, the

patrolman clearly had authority to take it into his possession, and its admission into evidence was proper. Similarly, the admission into evidence of the shotgun shell found on the rear seat of the automobile was proper. No search warrant is required to render competent in evidence an object seen in an automobile under such circumstances by an officer standing outside the vehicle. *State v. Howard,* 274 N.C. 186, 162 S.E. 2d 495; *State v. Craddock,* 272 N.C. 160, 158 S.E. 2d 25.

[17] In removing what turned out to be a detached gun stock, the officer struck it against the gun barrel concealed beneath the papers on the floor. The subsequent uncovering and removal of the gun barrel from the automobile was a mere continuation of the lawful removal of the gun stock and did not constitute an unreasonable search forbidden by the Fourth and Fourteenth Amendments to the Constitution of the United States. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed. 2d 419; *State v. Jordan,* 277 N.C. 341, 177 S.E. 2d 289. Clearly, probable cause existed to look beneath the papers for the barrel of the gun. We find no error in the admission of the shotgun barrel into evidence, but if it were error, it was harmless, since the possession of the ammunition and the other part of the gun would constitute the offense with which the defendant was charged by this warrant.

[18] The overruling of the defendant's motion for nonsuit in each case was not error. The defendant's contention that the burden was on the State to prove that his presence on the streets was for a purpose other than those excepted by the ordinance and by the curfew proclamation is without merit. In *State v. Connor,* 142 N.C. 700, 55 S.E. 787, Hoke, Justice, later Chief Justice, speaking for the Court, said.

> "It is well established that when a statute creates a substantive criminal offense, the description of the same being complete and definite, and by a subsequent clause, either in the same or some other section, or by another statute, a certain case or class of cases is withdrawn or excepted from its provisions, these excepted cases need not be negatived in the indictment, nor is proof required to be made in the first instance on the part of the prosecution. In such circumstance, a defendant charged with the crime who seeks protection by reason of the exception, has the burden of proving that he comes within the same."

To the same effect is *State v. Davis,* 214 N.C. 787, 1 S.E. 2d 104.

[19]　To hold otherwise would render the enforcement of the curfew impossible, since, the defendant remaining silent, as here, the State could never prove that his purpose in being upon the streets was not one of those excepted by the law. Consequently, the evidence for the State clearly established the defendant's violation of the curfew ordinance by his unexplained presence on the streets.

[20]　The shells stuck in his shoe tops, the gun parts lying on the floor of his automobile, within his easy reach, and the shell lying on the back seat of the vehicle were all within the possession of the defendant, he having the immediate power of control over them. *State v. Jones,* 213 N.C. 640, 197 S.E. 152. Consequently, the evidence of the State, if believed by the jury, was sufficient to support a finding of each element of the offense charged in the warrant relating to possession of a dangerous weapon.

[21]　Since G.S. 14-288.7, itself, makes the possession of the disassembled shotgun and the shotgun shells in the area in question a criminal offense and specifies the penalty therefor, and since the warrant relating to this offense is founded upon the statute, not the ordinance, the sentence imposable in that case is not limited to the penalty prescribed for such conduct by the ordinance. The sentence imposed does not exceed that authorized by G.S. 14-288.7 (c).

[22]　The consolidation for trial of the two charges against the defendant was not error. Both arose out of the same course of action and the same evidence used to prove the commission of the one would be competent and admissible in the trial of the other. Under such circumstances, the consolidation of the two cases for trial, so as to save the time of the court and the witnesses, was a matter in the discretion of the trial judge. *State v. White,* 256 N.C. 244, 123 S.E. 2d 483; *State v. Chapman,* 221 N.C. 157, 19 S.E. 2d 250; *State v. Combs,* 200 N.C. 671, 153 S.E. 252; G.S. 15-152.

[23]　It was not error to deny the defendant's request that, if he elected to take the stand and testify with reference to the charge of curfew violation only, the State be limited in its cross-examination to that matter and not be permitted to cross-

examine him concerning his possession of the disassembled shotgun and the shotgun shells. The court was not required, in advance of the defendant's taking the stand, to rule upon the limits of permissible cross-examination. Furthermore, the defendant's presence upon the street at the time of his arrest constituted a violation of the curfew ordinance, unless it was for a purpose excepted by the act or otherwise justified by law. Under the circumstances, the court not being advised to the contrary, it could assume that any testimony by the defendant, relating to the charge of curfew violation, would be concerned with an effort to establish justification for his presence at that point and time. If the defendant had undertaken to testify to circumstances purporting to bring him within an exception to the ordinance, or other justifiable reason for being on the street, the State would have had the right, upon cross-examination, to develop matters reflecting upon the credibility of his story. His possession, at that time and place, of a virtually concealed, though dismantled, shotgun, and of live shells therefor tucked in the tops of his boots—a somewhat unusual receptacle for such articles—might well be inquired into by the State for the purpose of casting doubt upon the alleged purity of his purpose in being upon the street at that time. Thus, the court was correct in refusing to limit the right of cross-examination as requested.

[24] The defendant's final assignment of error relates to the refusal of the trial judge, when requested to do so by the defendant, to include in his charge to the jury a reading of the portion of the ordinance relating to the authority of the Mayor to prohibit, during a proclaimed state of emergency, travel upon the public streets except by those so traveling for specified purposes. The entire ordinance was introduced in evidence. The court instructed the jury correctly as to the elements of the offense of curfew violation and that to convict the defendant thereof it must find these elements from the evidence and beyond a reasonable doubt. There being no evidence whatever purporting to bring the defendant within any exception to the ordinance, or otherwise to justify his presence upon the street at the time of his arrest, the court was not required to read to the jury, as part of the charge, the exact language of this section of the ordinance, or to instruct the jury concerning travel purposes not within the prohibition of the ordinance. *State v. Mundy,* 265 N.C. 528, 144 S.E. 2d 572; *State v. Williamson,* 238 N.C.

652, 78 S.E. 2d 763; *State v. Durham,* 201 N.C. 724, 161 S.E. 398.

In his brief in the Court of Appeals, the defendant asserted, without any further argument upon the point, that the proclamation of the state of emergency and the proclamation of the curfew violated his right to bear arms, guaranteed by the Second Amendment to the Constitution of the United States. This contention was not asserted in the trial court. Consequently, the trial court did not rule thereon. Upon the appeal to the Court of Appeals, no assignment of error related to this question. It is not asserted as a ground of appeal in the notice of appeal to this Court. It is not mentioned in the brief filed in this Court. However, in his brief filed in this Court, the defendant does state that he "reaffirms his arguments made in the Court of Appeals and relies upon the authority cited in his brief therein."

[25] This Court will not pass upon a constitutional question unless it affirmatively appears that such question was raised and passed upon in the trial court, if it could have been raised therein. *State v. Parrish,* 275 N.C. 69, 165 S.E. 2d 230; *State v. Dorsett* and *State v. Yow,* 272 N.C. 227, 158 S.E. 2d 15. Consequently, the question of the effect of the Second Amendment to the Constitution of the United States upon G.S. 14-288.7 and upon the ordinance of the City of Asheville and acts of the Mayor pursuant thereto is not presently before us. We do observe, however, that the Second Amendment to the Constitution of the United States, if it reaches State action at all, reaches it by way of the Due Process Clause of the Fourteenth Amendment and, therefore, would, at the most, forbid only an unreasonable and arbitrary restriction by State or municipal law upon the right to keep and bear arms. At no point in this proceeding has the defendant asserted any right under Article I, § 24, of the Constitution of North Carolina. Thus, we do not have before us any question as to the effect of that provision of the State Constitution upon G.S. 14-288.7 or upon the ordinance of the City of Asheville or the proclamation of the Mayor pursuant thereto. No opinion with reference thereto is herein expressed. For a discussion of that provision in relation to a different criminal charge, see *State v. Dawson,* 272 N.C. 535, 159 S.E. 2d 1.

There being no merit in any of the defendant's assignments of error, the decision of the Court of Appeals is affirmed.

Affirmed.

Justice MOORE did not participate in the consideration or decision of this case.