COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Beales and White
Argued at Richmond, Virginia

**PUBLISHED**

DIALLO OLUMNMINJI TURNER

v.      Record No. 1103-21-2

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE RANDOLPH A. BEALES
SEPTEMBER 20, 2022

FROM THE CIRCUIT COURT OF THE CITY OF FREDERICKSBURG
Charles S. Sharp, Judge

James Joseph Ilijevich for appellant.

Justin B. Hill, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a bench trial in the Circuit Court of the City of Fredericksburg, appellant Diallo

Turner was convicted of possession of a Schedule I or II controlled substance with the intent to

distribute, third or subsequent offense, driving with a suspended license, misdemeanor marijuana

possession, second or greater offense, and misdemeanor violation of emergency regulations. On

appeal, Turner asserts that the trial court erred in denying his motion to suppress. He also

challenges the sufficiency of the evidence establishing his intent to distribute.[1]

## I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial." *Gerald v.*

*Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381

(2016)). Around 1:00 a.m. on June 3, 2020, Officer J. Gilworth set up surveillance across the street

---

[1] Turner does not dispute the sufficiency of the evidence supporting any of his other
convictions.

from a motel in Fredericksburg after the police were alerted to possible criminal activity there. Within approximately fifteen minutes, Officer Gilworth observed three different individuals emerge from the motel and approach a gold SUV parked in the motel parking lot. Turner was sitting in the driver's seat. The three individuals approached the driver's side of the SUV at different times and remained there briefly before walking away.

Turner then drove the gold SUV out of the parking lot and left the motel. Officer Gilworth radioed Deputy David Cabrera, who was located nearby, and directed Deputy Cabrera to stop Turner's vehicle. Deputy Cabrera stopped Turner within two to three minutes of Turner's leaving the motel, as Turner was driving along Fall Hill Avenue in Fredericksburg.

Prior to the stop of Turner's vehicle, the City of Fredericksburg had declared a state of emergency and had passed an emergency order that provided, "The City of Fredericksburg shall be under a curfew between the hours of 8 p.m. and 6 a.m. beginning June 1, 2020 and ending June 3, 2020." During the curfew, the emergency order directed that "no person shall be present on any street, road, alley, avenue, park, or other public place in the City of Fredericksburg" between the hours of 8:00 p.m. and 6:00 a.m. The curfew contained exceptions for persons traveling to and from home, work, or places of worship, as well as exceptions for individuals in certain professions and anyone seeking emergency services. The emergency order expressly made any violations punishable as Class 1 misdemeanors.[2]

Deputy Cabrera testified that he stopped Turner because Turner "was out past curfew." When Deputy Cabrera approached Turner's vehicle, Turner raised his hands through the sunroof and asked Deputy Cabrera not to kill him. Deputy Cabrera asked Turner for his identification and

---

[2] In relevant part, Fredericksburg City Code § 26-34 provides, "It shall be unlawful to refuse or neglect to obey any rules and regulations as proclaimed by the Director of emergency management pursuant to this article or to refuse or neglect to obey any order of the Director of emergency management in connection therewith[.]"

attempted to calm him down. Upon checking Turner's information, Deputy Cabrera discovered that his driver's license had been suspended. As Deputy Cabrera was preparing summonses for Turner, Officer Gilworth arrived at the scene. Deputy Cabrera informed him that Turner's behavior during the stop was erratic. Based on information from Deputy Cabrera and based on his own observations at the motel, Officer Gilworth removed Turner from the vehicle and ran a police drug dog around it. The dog alerted at the driver's side door.

Once inside the vehicle, Officer Gilworth—a police canine handler and former narcotics detective—immediately smelled phencyclidine ("PCP"). When he opened the center console, the odor became even stronger. Officer Gilworth found a blue glass vial in a cigarette box inside the center console. The liquid in the vial smelled like PCP. In addition, tobacco flakes were in the liquid, suggesting to Gilworth that the PCP had already been used. Forensic tests later confirmed that the liquid in the vial was PCP. Turner also had approximately $161 in cash on his person.

During the search, Officer Gilworth found a second blue glass vial containing liquid residue and tobacco flakes. He also found a bag of marijuana between the driver's seat and center console. Officer Gilworth testified that PCP users will often "dip" a cigarette in a vial of PCP and ingest the PCP by smoking the cigarette. He noted that "dipping" often leaves flakes in the vial. Officer Gilworth noted that a PCP dealer will sometimes provide a buyer with cigarettes and dip them for the buyer.

After being advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), Turner admitted that marijuana was in the car, but he insisted that the blue vials contained "prayer oil." Eventually, however, Turner "admitted that the blue vials contained PCP, but stated that it was dead." Officer Gilworth understood this statement to mean "old or expired" PCP. Turner also admitted that he sold PCP "to support his habit" and that he "had sold to somebody approximately two to three hours" earlier. He stated that he sold "three dippers" to an individual for fifteen dollars

each. In addition, he told Officer Gilworth that he had smoked a dipper approximately twenty minutes before he left the motel.

Turner filed a pre-trial motion to suppress the evidence obtained from his vehicle, challenging the validity of the traffic stop and detention that preceded his arrest. In the motion to suppress, Turner asserted that he was seized in violation of his Fourth Amendment rights and argued that "[t]his stop was a seizure without reasonable or articulable suspicion of criminal activity and was not supported by any objective fact." He specifically argued that he "could have been engaged in any one of the numerous curfew exceptions" set out in the emergency order, and, therefore, he maintained that the officers did not have a reason to suspect that he had violated the curfew.

After hearing argument on the motion, the trial court denied the motion to suppress. The trial judge stated from the bench, "On the books in the City of Fredericksburg at this time, for whatever reasons, was a law, which made it unlawful to be on public streets in any form behind a vehicle, walking or in any other circumstances unless another exception can be established legitimizing your presence after that time." The trial judge continued:

> [U]nder the curfew statute, if you are out afterwards after hours, there is probable cause you are violating the law, unless you provide evidence or information which can cursory dissipate or eliminate the probable cause by showing that you are subject to one of those exceptions. There is no other way for the officer to make that distinction. What he has observed, the presence after hours in and of itself gives rise to probable cause that there is a violation. And for that reason, the stop based on those circumstances in this case, the Court finds to have been justified and not contrary to the constitution.

Consequently, the trial court denied Turner's motion to suppress.

At trial, Turner testified in his defense that he only visited the motel because he was looking for a room. He also stated that he had just come from Virginia Beach and didn't know anything about the City of Fredericksburg's curfew. Turner testified that he left Virginia Beach around

- 4 -

8:00 p.m. and drove to Fredericksburg, where he arrived around 11:00 p.m. Turner estimated that he remained at the Fredericksburg motel between fifteen and twenty minutes. He stated that he left the motel to find somewhere else to stay after learning that the motel had no available rooms.

Furthermore, Turner maintained at trial that he was frightened when the police stopped him because he did not understand why he had been stopped. He attributed his erratic behavior to his fear that the police would kill him. He stated that he lied about selling PCP because he believed that was what the police wanted him to say. However, he also testified that he offered to show the police on his phone when the sales had been made because he "wasn't sure what time" he had sold it. In addition, he testified that he told the police, "[I]f you give me my phone, I could tell you exactly what time it was, because it wasn't that much long ago."

The trial court subsequently convicted Turner of the charged offenses and sentenced him to fifteen years and ninety days of incarceration, with five years suspended. This appeal followed.

## II. ANALYSIS

### A. Motion to Suppress

Turner contends that the trial court erred in denying his motion to suppress because it erroneously ruled that his apparent curfew violation justified the stop of his vehicle.[3] He does not challenge the validity of the emergency order itself or his conviction for violating that order.

"A defendant's claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact[.]" *Murphy v. Commonwealth*, 264 Va. 568, 573 (2002). While we are bound to review *de novo* "the ultimate questions of reasonable suspicion and probable cause," *Ornelas v. United States*, 517 U.S. 690, 691 (1996), "we defer to the trial

---

[3] Although Turner asserts on brief that the trial court erred by ruling that the stop was supported by probable cause, he also argues that the stop was not supported even by a reasonable, articulable suspicion of criminal wrongdoing. In addition, at oral argument before this Court, Turner clarified that his position is that the officers did not have a reasonable, articulable suspicion of criminal activity.

court's findings of 'historical fact' unless such findings are 'plainly wrong or devoid of supporting evidence,'" *Saal v. Commonwealth*, 72 Va. App. 413, 421 (2020) (quoting *Barkley v. Commonwealth*, 39 Va. App. 682, 690 (2003)).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. These protections "extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Consequently, "stopping a motor vehicle and detaining the operator constitute a 'seizure' within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention is quite brief." *Lowe v. Commonwealth*, 230 Va. 346, 349 (1985).

In such cases, "[t]he Fourth Amendment requires 'some minimal level of objective justification' for making the stop." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)). The stop "must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). Accordingly, "[i]f a police officer has reasonable, articulable suspicion that a person is engaging in, or is about to engage in, criminal activity, the officer may detain the suspect to conduct a brief investigation without violating the person's Fourth Amendment protection against unreasonable searches and seizures." *McGee v. Commonwealth*, 25 Va. App. 193, 202 (1997) (*en banc*) (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (quoting *Prado Navarette v. California*, 572 U.S. 393, 397 (2014)). A reasonable, articulable suspicion is simply "'a particularized and objective basis' for suspecting

the person stopped of criminal activity." *Ornelas*, 517 U.S. at 696 (quoting *Cortez*, 449 U.S. at 417-18).

In this case, Deputy Cabrera stopped Turner within minutes of Turner's leaving the motel parking lot and pulling out onto the streets of Fredericksburg around 1:00 a.m. during what had been established as emergency curfew hours. Deputy Cabrera testified that he stopped Turner based on Turner's apparent curfew violation, given that the city's emergency order expressly provided that "no person shall be present on *any* street, road, alley, avenue, park, or other public place in the City of Fredericksburg" between 8:00 p.m. and 6:00 a.m. (Emphasis added). Moreover, the emergency order expressly made any violation, including any curfew violation, punishable as a Class 1 misdemeanor.

Turner argues that the officers lacked sufficient reason to believe that he had violated curfew, given that they did not know whether he fell within one of the stated exceptions. Specifically, in his motion to suppress, Turner argued that the stop of his vehicle was constitutionally invalid because he "could have been engaged in any one of the numerous curfew exceptions," such as those for persons traveling to and from home, work, or places of worship. However, as the trial judge aptly noted from the bench in this case, "There is no other way for the officer to make that distinction" than to initiate a traffic stop. Accepting Turner's argument would permit the curfew exceptions to entirely swallow the rule. Imposing an obligation to somehow determine whether a curfew exception applies to a person seen driving during prohibited hours before a stop could even be made to briefly investigate the reason for driving during the curfew would eviscerate the city's ability to enforce the curfew in the first place. *See, e.g.*, *State v. Dobbins*, 178 S.E.2d 449, 460 (N.C. 1971) (holding that a defendant charged with violating curfew had the burden to establish that he fell within an exception because "[t]o hold otherwise would render the enforcement of the curfew impossible").

The Fourth Amendment does not compel such an unworkable requirement. "Reasonable suspicion 'need not rule out the possibility of innocent conduct.'" *Raab v. Commonwealth*, 50 Va. App. 577, 581 (2007) (*en banc*) (quoting *Arvizu*, 534 U.S. at 277). Likewise, "the 'mere possibility of an innocent explanation' does not necessarily exclude a reasonable suspicion that criminal activity is afoot." *Hill v. Commonwealth*, 297 Va. 804, 815 (2019) (quoting *Shifflett v. Commonwealth*, 58 Va. App. 732, 736 (2011)). Rather, when particularized and objective facts give rise to a reasonable, articulable suspicion of criminal activity, the Fourth Amendment sanctions a brief investigatory stop for the very purpose of confirming or dispelling the suspicion that occasioned the stop in the first place.

Here, there can be no doubt that Deputy Cabrera's first-hand observation of Turner's driving on the streets of Fredericksburg around 1:00 a.m. during the emergency curfew period amounted to more than a mere "unparticularized suspicion or 'hunch' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Under these circumstances, the stop of Turner's vehicle was clearly grounded in "a particularized and objective basis" for suspecting that Turner had committed a crime. *See Ornelas*, 517 U.S. at 696. As such, the stop was "reasonable within the meaning of the Fourth Amendment." *Arvizu*, 534 U.S. at 278.

Consequently, for all of these reasons, we hold that the stop of Turner's vehicle did not violate the Fourth Amendment. Therefore, the trial court did not err in denying Turner's motion to suppress.

### B. Sufficiency of the Evidence of Intent to Distribute

We turn next to Turner's assertion that the evidence failed to support his conviction for possession of a Schedule I or II controlled substance with the intent to distribute because he argues the evidence failed to establish that he had the intent to distribute the PCP.[4]

---

[4] Turner does not dispute that he possessed the PCP.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

"Intent is the purpose formed in a person's mind and may, like any other fact, be shown by circumstances." *Secret*, 296 Va. at 228 (quoting *Commonwealth v. Herring*, 288 Va. 59, 75 (2014)). "Absent a direct admission by the defendant, intent to distribute must necessarily be proved by circumstantial evidence." *Holloway v. Commonwealth*, 57 Va. App. 658, 666 (2011) (*en banc*). Here, however, Turner actually admitted that he had distributed PCP on the same evening that he was arrested when he told the officers that he "had sold to somebody approximately two to three hours" earlier and that he sold PCP "to support his habit." He also specifically stated that he sold "three dippers" to an individual for fifteen dollars each, and even testified that he offered to show the officers information on his cell phone that would prove exactly when the sales occurred. Although Turner insisted at trial that he fabricated this confession because he feared the police, the trial court, sitting as factfinder, was free to reject

- 9 -

Turner's testimony. *See Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) ("In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt."). In addition, Deputy Cabrera testified that Turner was unusually nervous during their interaction, which is just one more additional circumstance that serves to corroborate Turner's confession to having sold PCP earlier that night.

Considering the totality of the circumstances, we certainly cannot say that no rational factfinder could have concluded that Turner possessed the PCP with the intent to distribute it. Consequently, we hold that the evidence was sufficient to sustain Turner's conviction for possession of a Schedule I or II controlled substance with the intent to distribute.

## III. CONCLUSION

For all of these reasons, we affirm the judgment of the trial court.

*Affirmed*.